**In re Sidney SPIELFOGEL, Debtor.**

**Bankruptcy No. 895–81846–478.**

United States Bankruptcy Court,
E.D. New York.

July 28, 1997.

Richard L. Stern, Huntington, NY, Operating Trustee.

Morgenthau, Greens, Goldfarb & Aronauer, P.C., Joseph Aronauer, New York City, for Bambu Sales, Inc. and Michael Spielfogel.

Rivkin, Radler & Kremer, Scott Y. Stuart, Uniondale, NY, for Trustee.

Teitelbaum, Braverman & Borges, P.C., J. Ted Donovan, New Hyde Park, NY, for the Interstate Cigar Co., Inc. Creditors' Committee.

Berkman, Henoch, Peterson & Peddy, P.C., Ronald M. Terenzi, Garden City, NY, for Debtor.

### DECISION REJECTING COMPROMISE AND SETTLEMENT

DOROTHY EISENBERG, Bankruptcy Judge.

Before the Court is a Motion for the approval of a compromise and settlement

brought jointly by Richard L. Stem, the Chapter 11 trustee herein (the "Trustee"), and Bambu Sales, Inc. ("Bambu") and the Michael Spielfogel Defendants,[1] Bambu and the Michael Spielfogel Defendants being the defendants in various legal actions brought by or on behalf of Sidney Spielfogel, an individual who is the debtor herein ("Sidney" or the "Debtor"). The proposed settlement is designed as a global compromise and settlement of all litigation between the Debtor's estate and the Michael Spielfogel Defendants and/or Bambu for a lump-sum payment of $700,000. The Michael Spielfogel Defendants and Bambu have indicated that the settlement offer is made on an "all or nothing" basis; either all of the litigation is resolved for $700,000 or the offer will be taken off the table. The individual Debtor has interposed opposition to the compromise and settlement. The Committee of Unsecured Creditors of Interstate Cigar Co., Inc. (the "ICC Creditors' Committee"), the largest creditor of the Debtor's estate,[2] supports the compromise and settlement, having withdrawn its prior opposition thereto.

On April 3, 1995, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. No committee of unsecured creditors has been appointed in this case. Pursuant to an Order dated October 5, 1995, the Debtor was removed as debtor-in-possession and, by Order dated October 18, 1995, Richard L. Stem, Esq. was appointed as operating trustee.

At the time of the filing of the petition, the Debtor had an interest in a corporation known as Bambu, which had been in business and operating for many years. After the Debtor filed his bankruptcy petition and be-

fore the appointment of the Trustee, the Debtor commenced an action (the "Dissolution Action") in the Supreme Court of the State of New York, County of Nassau, to dissolve Bambu pursuant to New York Business Corporation Law ("BCL") Sec. 1104–a. Pursuant to BCL Sec. 1118, Bambu elected to purchase Sidney's shares. As part of the Dissolution Action, a valuation hearing was scheduled to be held in Supreme Court to determine the value of Sidney's Bambu shares. By the instant Motion, the Trustee, Bambu and the Michael Spielfogel Defendants (sometimes referred to herein as the "Movants") seek to compromise and settle the Dissolution Action for the sum of $450,-000, foregoing a formal valuation hearing before the Supreme Court. The $450,000 figure was arrived at by the Movants based upon (i) a valuation of Bambu as of April 16, 1995 (the date immediately preceding the commencement by Sidney of the Dissolution Action) prepared by Goldstein Golub Kessler & Company, P.C., certified public accountants, which firm was engaged by Bambu and the Michael Spielfogel Defendants ("Bambu's Valuation Report"); and (ii) a valuation of Bambu as of April 16, 1995 prepared by Paritz & Company, P.A., certified public accountants, which firm was engaged by the Trustee (the "Trustee's Valuation Report").[3]

Additionally, the instant Motion seeks to compromise and settle for the sum of $250,-000 the action pending in the Supreme Court of the State of New York, County of New York, by the Debtor against Bambu and the Michael Spielfogel Defendants for, inter alia, breach of the Debtor's employment contract, wherein Sidney is seeking $5.65 million in

---

1. The Michael Spielfogel Defendants include Sarah Spielfogel, Lawrence Spielfogel, Nancy Spielfogel, Sandra Spielfogel Saiger, both individually and as executors under the will of Michael Spielfogel, deceased.

2. The ICC Creditors' Committee has numerous claims against the Debtor, including a judgment in the amount of $582,480.68, arising from a trial held before the Hon. Leonard Wexler in the United States District Court. Although the judgment has not yet been entered formally, the trial was concluded in September 1995, and a verdict was directed in favor of the ICC Creditors' Committee. Consequently, the amount of funds

which will be distributed to the ICC Creditors' Committee under any settlement, or after litigation if a settlement is denied, will have a substantial impact on the Committee's distribution to creditors in the Interstate Cigar Co., Inc. bankruptcy proceeding.

3. The ICC Creditors' Committee also commissioned a valuation of Bambu as of April 16, 1995, which was prepared by Ernst & Young, LLP (the "Committee's Valuation Report") and was used by the ICC Creditors' Committee to make an independent determination as to whether to support or oppose the instant Motion.

actual damages and $10 million in punitive damages, plus counsel fees.

The instant Motion also seeks to compromise and settle (i) the adversary proceeding brought in this Court by the Trustee against Bambu to recover Debtor's pro-rata share of a 1995 dividend declared by Bambu (the "Dividend Action") and Bambu's appeal of the Court's determination therein; (ii) a third-party action in the United States District Court for the Eastern District of New York for damages resulting from a distress termination of the pension plan of Interstate Cigar Co., Inc. (the "Pension Action"), an entity in which the Debtor and Michael Spielfogel were principals; and (iii) the adversary proceeding brought in this Court by the Trustee against Bambu, seeking an injunction with respect to the dissemination of information to interested parties in connection with the valuation of Bambu stock (the "Injunction Action") and Bambu's appeal of the Court's determination therein.

At a hearing held before this Court on June 13, 1997, the parties all agreed that there was little, if any, value to either party on behalf of the Dividend Action [4] and the Pension Action,[5] and that the Injunction Action becomes moot in the event there is no further need to value the Bambu stock. Therefore, the Court will confine its discussion and analysis to whether the compromise and settlement of the Dissolution Action for $450,000 and the Employment Action for $250,000 is fair and equitable and in the best interest of the estate.

On the evidence before it, including all of the papers filed herein by the Trustee, Bambu and the Michael Spielfogel Defendants, the Debtor and the ICC Creditors' Committee, and after hearing oral argument by counsel at the June 13, 1997 hearing, and after consideration of post-hearing submissions by the Trustee and the Debtor, the Court is of the opinion that the settlement offer falls below the lowest point of reasonableness required for approval by the controlling authority in this Circuit.

## BACKGROUND

In 1950, Sidney and his brother, Michael, now deceased, formed Seckler Brothers, Inc., a New York corporation engaged in the business of operating a retail cigar store. From those beginnings, Sidney and Michael proceeded to develop, organize and operate, as principals, a large family of corporations (including Bambu), which at one time had total revenues exceeding $200,000,000 per annum and employed 1,000 people. For the most part, Sidney served as President of these corporations. With the exception of Bambu, all of the corporations owned and operated by Sidney and Michael have ceased operations.

Bambu was, and is now, an enormously profitable company, a veritable "cash cow," which owns valuable trademarks and has virtually no debt except a contingent claim of certain former shareholders. Bambu is in the business of importing and distributing cigarette rolling paper throughout the world. The rolling paper is sold primarily under the Bambu family of trademarks. Bambu has made a Subchapter S election under Section 1362 of the Internal Revenue Code. Historically, every March or early April, Bambu declared a dividend equal to the amount of taxes each shareholder would have to pay on his or her income, so as to provide the shareholder with the funds needed to pay the taxes without utilizing the salary received by such shareholder. In addition, each shareholder who worked for Bambu received very

4. The settlement provides that the Trustee waives all rights to a Bambu stock dividend which was previously ordered paid to the estate by this Court, and which is on appeal. The Movants believe that the estate's tax liability on the dividend would virtually wipe out any benefit to the estate.

5. The Department of Labor brought an action against Sidney in the United States District Court for the Eastern District of New York for breach of fiduciary duties as a trustee of the Interstate Cigar Pension Plan. Michael Spielfogel was the co-fiduciary of the pension plan but died prior to the Department of Labor's suit against Sidney. Sidney filed a third-party action against the Michael Spielfogel Defendants, individually and as Executors and Trustees u/w/o Michael Spielfogel, for indemnity and contribution. Conceding Michael's co-fiduciary relationship with Sidney under the Interstate Cigar Pension Plan, Bambu has volunteered to pay the $330,000 shortfall in the pension plan.

substantial salaries. For example, Sidney, Michael, and after Michael's .death, Sarah Spielfogel, received annual salaries of approximately $300,000.

On December 22, 1987, Sidney and Michael, acting for themselves and their respective family member shareholders (with control of 86.32% of Bambu), entered into a Memorandum Agreement (the "Agreement"). The purpose of the Agreement was to resolve various disputes which had arisen between Sidney and Michael with regard to the management and operation of their businesses (Debtor's Opposition to Compromise & Settlement, para. 6). The Agreement also provides specific guidelines for the election of directors and officers, which guidelines were to supersede any prior document in that regard (Debtor's Opposition to Compromise & Settlement, para. 7). All of the litigation which is proposed to be compromised and settled by the instant Motion, either directly or indirectly, stems from the Agreement. A threshold issue to be determined in the Dissolution Action and the Employment Action is whether the Agreement binds Bambu and regulates its management and operations, even though Bambu is not a signatory thereto and, at the time of execution of the Agreement, the signatories (Sidney and Michael) owned a majority of the shares, but less than all of the outstanding stock of Bambu.

Originally, Bambu's stock was owned by three main groups. The first group consisted of members of Sidney's family (43.16%); the second group consisted of members of Michael's family (43.16%); and the third group (the "Non–Spielfogel Shareholders") consisted of two other shareholders who held 13.68%. On September 23, 1994, the ICC Creditors' Committee was granted a judgment in excess of $500,000 against Sidney. Pursuant to the judgment, in November 1994, Bambu was served with a property execution by the Nassau County Sheriff, levying on Sidney's Bambu shares. To keep control of Bambu out of the hands of the ICC Creditors' Committee, on October 28, 1994

the Michael Spielfogel family purchased Bambu stock from Joseph Cutuli, a Non–Spielfogel Shareholder (Aff. of Nancy Spielfogel, paras. 17–19, annexed as Exh. M to Yudell Aff. in Support of Global Settlement). Mr. Cutuli owned 4.826 shares or approximately 7.92% of Bambu (the "Cutuli Shares"). This stock, coupled with the Michael Spielfogel family's existing 43.16% interest in Bambu, gave the Michael Spielfogel family control of Bambu (51.08%). At present, Sidney owns 21.585% of the outstanding shares of Bambu, and Sidney's children, Joel, Gary and Stacy, own an aggregate of 21.579% thereof.[6]

At a shareholders' meeting held on February 16, 1995, after the Michael Spielfogel family obtained control of Bambu, Sidney was ousted from the management and control of the affairs of Bambu. On that date, the Michael Spielfogel family assumed control of Bambu's Board of Directors and members of their family were elected as officers of Bambu. In the Employment Action, the Debtor alleges, among other things, that the Michael Spielfogel Defendants, knowing that the Bambu shares owned by Sidney and his sons were subject to execution sale, purchased the Cumuli shares to obtain control of Bambu, with the ultimate goal of acquiring the Sidney Spielfogel family's shares at "bargain basement" prices (Verified Complaint, paras. 39–54, annexed as Exh. C to Yudell Aff. in Support of Global Settlement). Approval of the settlement offer proposed by Bambu and the Michael Spielfogel Defendants would accomplish that goal, since the $450,000 offered for Sidney's shares appears to be well below the value of such shares.

### FACTS

1. The Debtor filed a Chapter 11 petition on April 3, 1995.

2. The Debtor was originally represented by an attorney not well versed in Bankruptcy Laws and Procedures.

---

**6.** By Stipulation between Gary Spielfogel and the ICC Creditors' Committee, Gary is obligated to sell his 7.193% interest in Bambu to satisfy a $300,000 judgment against him and in favor of the ICC Creditors' Committee. An auction sale of Gary's shares was scheduled to be held by the Court on June 13, 1997; however, the sale did not go forward because the Court determined that the one offer received was far below the actual value of the shares.

3. The Debtor was removed as debtor-in-possession on October 5, 1995, and the Trustee was appointed by Order dated October 18, 1995.[7]

4. The Trustee owes a fiduciary duty to the individual Debtor, as well as to the creditors of the estate. In addition, the Trustee has a duty to take all steps necessary toward maximizing the value of the estate's assets, including all claims owned by the estate against third parties.

5. The Trustee is not settling because he would not be successful at trial. In fact, the Trustee is confident that a positive result could be obtained for this estate through litigation. The Trustee's confidence notwithstanding, however, he believes approval of the settlement is appropriate, "based on the tantamount goal of ensuring creditor recovery and the informed judgment of the counsel involved in this settlement." (Trustee's Reply to Debtor's Opposition to Compromise & Settlement, para. 26.)

6. The global compromise and settlement before the Court is made on an "all or nothing" basis, with the $700,000 lump-sum payment to be attributable $450,000 towards the settlement of the Dissolution Action and $250,000 towards the settlement of the Employment Action and all pending litigation and appeals to be discontinued and/or withdrawn. Thus, approval of the global settlement would eliminate the risks of litigation and further administrative expenses for professional services.

7. In the event the global settlement is approved, there will be sufficient funds available to pay all administration and priority claims and make a $425,000 distribution to the ICC Creditors' Committee, the largest

creditor of Sidney's estate (ICC Creditors' Committee's Aff. in Support of Global Settlement, para. 10).[8] Other than the ICC claim, Debtor's pre-petition debt consists of approximately $30,000 to taxing authorities and one or two very minor, insignificant unsecured claims. The parties involved in this Motion are the only actual parties in interest in the resolution of the pending litigation with Bambu and the Michael Spielfogel Defendants.

8. Bambu is a closely-held corporation organized and existing under and by virtue of the laws of the State of New York. which has made a Subchapter Selection for purposes of Section 1362 of the Internal Revenue Code (Yudell Aff. in Support of Global Settlement, Exh. K).

9. Bambu is enormously profitable, with gross profits in excess of $1.5 million for the years 1986 through 1989 and in excess of $1 million for the years 1990 through 1995, with the exception of 1990 through 1992, when profits fell below $1 million due to cash-flow problems created by unusual circumstances in the cigarette paper business described more fully below (Yudell Aff. in Support of Global Settlement, Exhs. D, E, and F; Supplemental Aff. of Sidney Spielfogel, Exh. B).

10. On April 17, 1995, after his bankruptcy petition was filed, the Debtor commenced the Dissolution Action in the Supreme Court of the State of New York, County of Nassau, pursuant to BCL Sec. 1104–a to dissolve Bambu.

11. On August 15, 1995, Bambu elected, pursuant to BCL Sec. 1118, to purchase the Debtor's Bambu shares.

12. The Debtor owns 13.146 shares of Bambu, constituting a 21.585% ownership of

---

7. The Debtor was removed as debtor-in-possession and the Trustee appointed primarily because the Debtor was delinquent in his duties to pay post-petition expenses of administration as they became due, specifically federal and state income taxes. The Debtor also had not opened the requisite debtor-in-possession bank accounts or filed proper operating reports.

8. The ICC Creditors Committee has also negotiated a further concession from Bambu; namely, if the settlement is approved, Bambu will withdraw its pending appeal of this Court's Order subordinating Bambu's claim in the Interstate

Cigar Co., Inc. bankruptcy case. This would have the effect of immediately making available for distribution to the constituents of the ICC Creditors' Committee $250,000 which is presently being held in escrow pending the outcome of the appeal (ICC Creditors' Committee's Aff. in Support of Global Settlement, para. 18). The Court notes, however, that this is not a material factor in analyzing the proposed compromise and settlement. The Court must determine what is fair and equitable and in the best interests of the Estate of Sidney Spielfogel, not the Estate of Interstate Cigar Co., Inc.

Bambu, which he (and now his operating trustee) is obligated to sell to Bambu (Yudell Aff. in Support of Global Settlement, para. 5(a)).

13. Under BCL Sec. 1118(b), the value of Sidney's Bambu shares is fixed as of April 16, 1995 (the "Valuation Date"), the date immediately preceding the commencement of the Dissolution Action (Yudell Aff. in Support of Global Settlement, para. 5(c)).

14. For purposes of the Dissolution Action, the value of Sidney's shares will be determined without taking into account a minority discount (Yudell Aff. in Support of Global Settlement, para. 5(d)).

15. To assist the Court in evaluating the compromise and settlement, Bambu and the Michael Spielfogel Defendants have submitted Bambu's Valuation Report (Yudell Aff. in Support of Global Settlement, Exh. E). Bambu's Valuation indicates that as of the Valuation Date, prior to discount. Bambu was worth $1,630,000 under an income approach and $1,930,000 under an analysis of sales of comparable businesses. In turn, this would value Sidney's shares, prior to any discounts, at $351,835 to $416,590. Because Bambu is a closely held corporation, Bambu's expert reduced its valuation of Bambu by 25% due to the lack of marketability of Bambu.

16. The Motion also is supported by the Trustee's Valuation Report (Yudell Aff. in Support of Global Settlement, Exh. F) indicating that, as of the Valuation Date, prior to any discounts, Bambu was worth $5,947,000 under an income or capitalized earnings approach (also known as an investment approach), and the value of Sidney's 21.585% interest, net of all appropriate discounts, was $835,000. However, the $835,000 figure takes into account a 15% minority discount, which even Bambu concedes is inappropriate in this case. Consequently, the $835,000 value of Sidney's shares pursuant to the Trustee's Valuation Report should be adjusted upward by 15% to $1,015,000 (Debtor's Opposition to Compromise & Settlement, para. 37).

17. The Movants have also submitted a portion of the Committee's Valuation Report, which values Bambu at $2,210,000 as of the Valuation Date (Yudell Aff. in Support of Global Settlement, Exh. D) and Sidney's shares at $477,028 (Yudell Aff. in Support of Global Settlement, para. 8(b)).

18. The Debtor has not submitted an expert valuation because Bambu and the Michael Spielfogel Defendants, claiming confidentiality, would not provide the raw numbers necessary for Sidney to have such a valuation prepared (Tr. of 6/13 Hearing, p. 52).

19. The Trustee's Valuation Report was prepared without the benefit of input from the Debtor, who effectively ran Bambu until his ouster and is intimately acquainted with all of the events which affected Bambu's profitability during the years immediately preceding the Valuation Date (Tr. of 6/13 Hearing, pp. 51–52).

20. It is uncontroverted that neither Bambu's Valuation Report nor the Trustee's Valuation Report takes into account that certain non-recurring items affected the historical sales figures for the years under review by the Movants' experts. Specifically, the years 1991 and 1992 were aberrations in terms of low profits, the causes of which were Larry Spielfogel having "flooded" the cigarette paper market with Bambu papers,[9] thereby causing a drastic reduction in price and Bambu's profits, as well as Ozark Trading Co.'s purchase and distribution of large

---

9. In 1990, Larry Spielfogel, one of the Michael Spielfogel Defendants, brought into the United States a tremendous quantity of Bambu brand cigarette paper without Bambu's permission and in derogation of Bambu's exclusive distribution rights. This unauthorized action by Larry Spielfogel had the effect of "flooding" the marketplace. Because of such a drastic increase in the supply, the prices were driven down and, as a result, Bambu's sales volume dropped and its profit margins fell. Bambu commenced a lawsuit against Larry Spielfogel for his conduct but, because of the familial nature of the business, the suit was eventually dropped. However, to help preserve what was left of the marketplace, in December 1991 Sidney Spielfogel and Sarah Spielfogel, Michael's widow, personally purchased 155 cases of the Bambu cigarette paper from International Trade Expo, Inc., Larry Spielfogel's company, for a purchase price of $46,035.00 (Aff. of Sidney Spielfogel, paras. 8–9; Supplemental Aff. of Sidney Spielfogel, para. 11).

quantities of unsalable "gray" papers.[10] Since these factors no longer exist, the valuations are skewed and the actual value of the shares for these years is not accurately reflected.

21. Bambu's Valuation Report does not consider 1995 sales figures. Instead, it reaches back to 1990, which had dismal sales figures, approximately 50% of the sales compared to 1994. Even more of a discrepancy is revealed when 1990 figures are compared to 1995: $1.2 million for 1990 compared to $2.9 million annualized for 1995. The use of the 1990 figures skews the ultimate valuation downward (Debtor's Opposition to Compromise & Settlement, para. 31).[11]

22. The Movants offer the Cutuli transaction as an objective measure of Bambu's value as of the Valuation Date. The Cutuli Shares, which constituted 7.924% of Bambu, were sold to the Michael Spielfogel family for $150,000, six months prior to the Valuation Date. Based upon the Cutuli transaction, Bambu had a worth of $1,892,983 on the Valuation Date ($150,000 divided by .07924), and Sidney's 21.585% interest in Bambu is worth $408,600 ($1,892,983 × .21585) (Yudell Aff. in Support of Global Settlement, para. 8). However, the Court finds that this is not an indication of Bambu's value for purposes of the Dissolution Action. Cutuli had a 7.924% interest in a closely held Subchapter S corporation. Although Cutuli did not receive any dividends on his shares, he remained liable for his share of the tax on the profits of the corporation. As such, he needed to sell his shares for whatever he could get in order to cut his losses. This is not analogous to a valuation under BCL Sec. 1118. Such a valuation is in lieu of a sale of the *entire corporation* after which the proceeds are distributed to the shareholders *pro rata*. The failure of the analogy to the sale of the Cutuli Shares is precisely the reason that courts have rejected applying a minority discount to a valuation under BCL Sec. 1118 (Debtor's Opposition to Compromise & Settlement, para 38).

23. Based upon Bambu's Valuation Report, the Trustee's Valuation Report, the Committee's Valuation Report and an analysis of the Cutuli transaction, the Movants assert that the value of Sidney's stock is between $350,000 and $425,000 (Yudell Aff. in Support of Global Settlement, para. 14). The Court finds that this valuation is based on unreliable data compiled from raw numbers and information supplied to the experts solely by Bambu and the Michael Spielfogel Defendants, without any consultation with the Debtor.

24. The Court also finds unreliable the Debtor's bald assertion, without sufficient evidence to support it provided to this Court, that the value of Bambu is in excess of $10 million and the value of Sidney's shares is in excess of $2 million.[12] However, such an assertion may be advanced in any appropriate forum which will ultimately determine the value of these shares.

25. The Court finds that the Trustee did not adequately investigate the value of the

---

**10.** In or about 1992, when the tobacco companies were heavily involved in marketing "light" products, Bambu sought to manufacture and market a "light" cigarette paper. This endeavor was unsuccessful due to poor sales and, as a result, the manufacturer was left with enough "light" paper or "gray" paper to make over 1 million booklets, as it could not be sold as regular paper (the papers had "light" imprinted on them). A company named Ozark Trading Co. purchased all of the "light" paper from the manufacturer, allegedly to sell it in South Africa. However, the "light" papers had been packed into regular Bambu booklets (even though the papers had "light" imprinted on them) and shipped to South Africa. Within a few weeks, these booklets started appearing in stores in New York. As a result, Bambu sued Ozark for damages and to enjoin any further sales of the "light" paper by Ozark and its customers in the United States. Although the litigation was successful, the unlawful sale of the "light" papers and the ensuing litigation severely reduced Bambu's profit margin (Aff. of Sidney Spielfogel, paras. 10–11).

**11.** The Court notes that in each of the years 1986 through 1989, Bambu had sales of at least $2.5 million and gross profits of at least $1.5 million (Supplemental Aff. of Sidney Spielfogel, para. 14, and Exh. B thereto). It was not until 1990, when Larry Spielfogel began to flood the market, that sales and gross profits were reduced by approximately 50% from the previous year.

**12.** The Debtor reaches this valuation by applying the capitalization rate of 5 used in the Trustee's Valuation Report to the year 1995's adjusted income of $2,086,000 (Debtor's Opposition to Compromise & Settlement. para. 35).

estate's interest in the Dissolution Action because he failed to ascertain pertinent facts from the Debtor that might have led to a more realistic valuation.

26. Based on the unreliability of the various valuations which have not been subjected to a factual hearing subject to sworn testimony and cross-examination, the Court is unable to find that $450,000 is a reasonable settlement offer for Sidney's stock interest in Bambu.

27. Michael Spielfogel and Sidney Spielfogel entered into the Agreement which is the subject of the Employment Action on December 22, 1987. (Yudell Aff. in Support of Global Settlement, Exh. I).

28. Paragraph 2(d)(i) of the Agreement provides that Sidney and Michael shall each receive a salary for his life and, upon his death, his wife shall receive the salary that he was receiving at the time of his death.

29. Paragraph 2(d)(ii) of the Agreement provides that upon the death of either Sidney or Michael, the survivor shall continue to receive the salary he was receiving at the time of death of the other, with yearly increases pegged to the Consumer Price Index. At the time of Michael's death, the salaries were $300,000 per year. Therefore, in the Employment Action, the Debtor claims $300,000 per year, plus CPI increases from 1989, the year of Michael's death, for a total claim of $5.65 million.

30. Paragraph 6(a) of the Agreement provides that control shall be exercised by a Board of Directors consisting of seven members, three of which shall be selected by the Sidney Spielfogel family and three by the Michael Spielfogel family. Paragraph 6(a) further provides that the seventh Board member shall be President, provided that he is not a family member or, in the event the President shall be a family member, then the seventh Board member shall be a non-family party elected by a majority vote of the other six Board members.

31. Paragraph 6(m) of the Agreement provides that a two-thirds (2/3) vote of the then existing Board of Directors is required to increase or decrease the size of the Board.

32. Some time after the execution of the Agreement, by unanimous consent, the Board was reduced to five, of which two Directors were designated by Sidney and two by Michael, and the fifth was Robert Goldfarb, a non-family party who was a partner in the firm of Morgenthau, Greenes and Goldfarb, Bambu's counsel. By unanimous consent, the Board was then reduced to three, of which one Director was designated by Sidney and one by Michael, and the third was Robert Goldfarb. (Verified Complaint, para. 13, filed as Exh. C to Yudell Aff. in Support of Global Settlement; Aff. of Sidney Spielfogel, para. 13.)

33. Paragraph 6(e) of the Agreement provides that meetings of the Board of Directors shall be held on seven (7) days notice, given by certified mail, return receipt requested, or by hand delivery.

34. The complaint in the Employment Action contains five causes of action.[13] The first cause of action is against Bambu for breach of Sidney's purported lifetime employment contract; the second cause of action is for breach of contract against the Michael Spielfogel Defendants: the third cause of action is against the Michael Spielfogel Defendants for fraud in acquiring control of Bambu; the fourth cause of action is against the Michael Spielfogel Defendants for breach of fiduciary duty; and the fifth cause of action is against the Michael Spielfogel Defendants for inducing Bambu to terminate Sidney's purported lifetime employment contract.

35 The Trustee has a duty to make inquiry of the Debtor regarding the factual allegations plead by Bambu and the Michael Spiel-

---

13. By decision dated December 15, 1995, the Hon. Beatrice Shainswit dismissed the complaint insofar as it asserted claims against Morgenthau Greenes Goldfarb & Aronauer, P.C., Bambu's law firm, and Alan Sills, Esq., a member of the firm. The remaining defendants in the Employment Action are Bambu and the Mi-

chael Spielfogel Defendants. The December 15, 1995 decision also disqualifies Morgenthau Greens Goldfarb & Aronauer P.C. from representing the Michael Spielfogel Defendants in the Employment Action (Yudell Aff. in Support of Global Settlement, Exh. H).

fogel Defendants in the Employment Action and the assertions as to the viability of the Employment Action contained in the Yudell Affidavit in Support of the Global Settlement, so as to make an informed decision as to the value of the Employment Action to the estate. The absence of any contrary factual allegations by the Trustee in the instant Motion (prepared initially by counsel to Bambu and the Michael Spielfogel Defendants) evidences the Trustee's failure to properly investigate the viability of the Employment Action and its value to the estate.

36. The Movants propose to settle the Employment Action for only $250,000 because (i) Bambu did not sign the Agreement; (ii) the Agreement does not include Bambu as one of the "Companies" whose shareholders' agreements were being amended by the execution of the Agreement; (iii) Michael and Sidney did not have the authority to bind Bambu; (iv) the Agreement was not intended to be a lifetime employment contract; and (v) the Debtor was terminated for various acts which were detrimental to Bambu.[14]

37. At the time of the execution of the Agreement, Michael and Sidney collectively controlled a majority of the stock (52.56%) of Bambu. (See the Election by Small Business Corporation on Form 2553, filed with the Internal Revenue Service in December 1996 by the Sidney Spielfogel family, the Michael Spielfogel family, the Herman family,[15] Joseph Cutuli and Robert Botwinick, constituting all of the shareholders of Bambu at that time, which are annexed to the Yudell Aff. in Support of Global Settlement as Exh. K.)

38. At the time of the execution of the Agreement, Michael and Sidney shared the management of Bambu (Bambu's Valuation Report, p. 6, filed as Exh. E to the Yudell Aff. in Support of Global Settlement).

39. It is *res judicata* that Michael Spielfogel died in 1989, after which time Sidney continued in his management role and *"Michael's widow, Sarah, succeeded to Michael's employment contract"* (Decision of Hon. Beatrice Shainswit, J.S.C., p. 2, filed as Exh. H to the Yudell Aff. in Support of Global Settlement). Thus, Sarah derived the benefit under the Agreement of Michael's $300,000 salary. That decision further stated that, as of 1994, Sidney, together with his family, owned 44% of Bambu's outstanding shares, Michael's family owned 44%, and the balance was owned by two Bambu associates, Joseph Cutuli (who owned 7%) and David Fund (who owned 5%). Cutuli offered to sell his shares to Sidney for $175,000. Sidney declined because he lacked the necessary funds and, as a defendant in the lawsuit initiated by the ICC Creditors' Committee, he feared that his Bambu shares might be seized and sold to enforce a judgment. Sidney urged Bambu to purchase the Cutuli Shares, but Bambu did not do so. Instead, Michael's family purchased the Cutuli shares, thereby gaining control of Bambu. On February 16, 1995, Bambu held a shareholders' meeting and elected two of the Michael Spielfogel Defendants, Nancy Spielfogel and Sandra Spielfogel Saiger, as Directors, as well as Robert Goldfarb. Immediately thereafter, the new Board of Directors met and terminated Sidney's employment with Bambu. (Decision of Hon. Beatrice Shainswit, J.S.C., p. 2, filed as Exh. H. to Yudell Aff. in Support of Global Settlement.)

40. For purposes of ultimately determining the Employment Action, issues of fact include, but are not limited to, whether during the eight years from the execution of the Agreement to February 1995 Bambu paid identical salaries to Sidney and Michael and paid Michael's salary to his widow after his

---

14. Bambu and the Michael Spielfogel Defendants allege that they acted properly in terminating Sidney because (i) Sidney ran his own business out of Bambu's offices and did not devote himself to Bambu's affairs; (ii) Sidney asserted a third-party claim against Michael's estate and members of the Michael Spielfogel family in the Pension Action; and (iii) Sidney took a position adverse to Bambu in the litigation between Bambu and the Herman family (Yudell Aff. in Support of Global Settlement, para. 18).

15. The Hermans are a branch of the Spielfogel family. The Hermans had substantial interests in both Interstate Cigar Co. and Bambu. In or about January 1989, ICC and Bambu agreed to purchase the Hermans' interests. After the transaction, the issued and outstanding shares of Bambu were reduced from 99.99 shares to 63.50 shares.

death; whether salary adjustments were equal for members of each family; whether each family had equal representation on the Board with one neutral member; whether the February 16,1995 meeting of shareholders was regularly called and adequately noticed; and whether the procedures for electing directors were complied with. (Debtor's Post–Hearing Memo in Opposition to Compromise & Settlement, para. 14; Aff. of Sidney Spielfogel, para. 13).

41. Issues of law to be determined in the Employment Action include, but are not limited to, whether a majority of the shareholders could bind Bambu regarding the management of the corporation or, alternatively, whether Bambu bound itself to the Agreement by ratifying it; that is, whether Bambu engaged in conduct consistent with intent to adopt the Agreement, whether Bambu was charged with knowledge of the material facts of the Agreement, and whether Bambu could authorize the execution of the Agreement in the first instance (Post–Hearing Memo in Further Opposition of Compromise & Settlement, para. 13).

42. After considering the issues, the Court finds that the Employment Action is a viable action in which the Trustee/Debtor has some likelihood of success. The Court does not have sufficient information before it to estimate the value of the estate's interest in the action;[16] however, without more factual information indicating an adverse finding of the issues raised, $250,000 appears to be well below the lowest reasonable value of this asset.

43. The Trustee has not aggressively pursued the estate's claims in the Employment Action, believing that no one could ascribe a definitive value to such action, that it was speculative and posed a financial risk to the estate (Trustee's Reply to Debtor's Opposition to Compromise & Settlement, pp. 7–8), and would require the expenditure of litigation costs which may result in reducing any distribution to creditors of this estate.

44. The Debtor represented at the June 13, 1997 hearing that his family members are willing to undertake the legal expenses of the Employment Action, so that it will not be a financial burden to creditors (Tr. of 6/13 Hrg., p. 80). Thus, the Court finds that the continued litigation of the Employment Action will not result in an additional administrative expense to the estate to be borne by the creditors.

## DISCUSSION

 Fed. R. Bankr.P. 9019 empowers the Bankruptcy Court to approve compromises and settlements if they are fair and equitable and in the best interests of the estate. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499 (Bankr.S.D.N.Y. 1991).

> The words "equity" and "fairness" are not only terms of art in bankruptcy, they are catch words of bankruptcy law in general. Equitable considerations should be preeminent in the exercise of bankruptcy jurisdiction. Decisions as central to bankruptcy proceedings as approval of settlements cannot be visceral. They must issue from reason and rest upon factual undergirdings.

*In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y.1988). A decision to either accept or reject a compromise and settlement is within the sound discretion of the Court. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. at 504. Although a bankruptcy court may consider the trustee's opinion in deciding whether to approve a proposed settlement, the Court must make an independent determination and cannot simply accept the Trustee's word that the settlement is reasonable or rubber stamp the Trustee's proposal. *Nellis v. Shugrue (In re Eastern Air Lines, Inc.)*, 165 B.R. 115, 122 (S.D.N.Y. 1994); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y.1993).

 In examining the settlement, it is the responsibility of the bankruptcy judge to

---

16. The Movants have not furnished the Court with Bambu's Certificate of Incorporation, By-laws, corporate resolutions, stock transfer records, or canceled stock certificates, which are within the exclusive custody and control of Bam-

bu and the Michael Spielfogel Defendants. Thus, the Court cannot determine whether the Board of Directors ever formally ratified or adopted the Agreement or properly analyze the Movants' BCL Sec. 620 argument.

canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness. *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), quoting, *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972), *cert. denied* sub nom., *Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). Because a bankruptcy judge need only canvass the issues and does not determine and rule upon disputed facts and questions of law, a trial or "mini trial" on the merits is not required. *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 499, 504 (Bankr.S.D.N.Y.1991), quoting, *In re Blair,* 538 F.2d 849, 851 (9th Cir.1976).

■■■ The Court's methodology in determining the reasonableness of the proposed compromise and settlement emanates from the Supreme Court's holdings in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), as further elucidated by *In re Texaco Inc.,* 84 B.R. 893 (Bankr.S.D.N.Y.1988). *TMT Trailer* and *Texaco* have resulted in Bankruptcy courts in this Circuit considering the following factors in reaching an ultimate decision in a Rule 9019 motion:

(1) The balance between the likelihood of success compared to the present and future benefits offered by the settlement;

(2) The prospect of complex and protracted litigation if the settlement is not approved;

(3) The proportion of the class members who do not object or who affirmatively support the proposed settlement;

(4) The competency and experience of counsel who support settlement;

(5) The relative benefits to be received by individuals or groups within the class;

(6) The nature and breadth of releases to be obtained by officers and directors; and

(7) The extent to which the settlement is the product of arm's length bargaining. *Id.* 84 B.R. at 902. The bankruptcy court should also consider the paramount interest of the creditors and give proper deference to their reasonable views. *In re Woodson,* 839 F.2d 610, 620 (9th Cir.1988); *In re American Reserve Corp.,* 841 F.2d 159, 161 (7th Cir. 1987).

■■■ For the past two years this Court has presided over this bankruptcy case and, since 1989, the bankruptcy case filed by Interstate Cigar Co., Inc. Consequently, this Court has come to know these related bankruptcy cases very well. Mindful that this bankruptcy case is unusual because it involves an individual Chapter 11 debtor, the installation of an operating trustee in an individual reorganization case, and an estate which may arguably not be insolvent, the Court must consider the individual Debtor's residual rights in the estate. This Debtor's estate has a potential possibility to result in a surplus of funds over and above what may be due to the creditors who urge the acceptance of the proposed settlement.

■■■ A Chapter 11 trustee who manages the affairs of a debtor under Section 1108 of the Bankruptcy Code is bound by a duty of loyalty. This duty requires that the Trustee refrain from self-dealing, avoid conflicts of interest and the appearance of impropriety, treat all parties to the case fairly, and maximize the value of the estate. *See* 7 *Collier on Bankruptcy,* Sec. 1108.09 (15th ed. rev. 1997), *citing, inter alia Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 352, 105 S.Ct. 1986, 1992–93, 85 L.Ed.2d 372 (1985); *In re Central Ice Cream Co.,* 836 F.2d 1068 (7th Cir.1987). The Court asked the parties to research the cases for facts and circumstances that are similar to the facts and circumstances in the instant bankruptcy case. Neither the Trustee nor the Debtor was successful in unearthing cases that were directly on point. But each of them has offered the Court an analogy.

The Trustee has analogized this set of circumstances to the facts in *In re Bowman,* 181 B.R. 836 (Bankr.D.Md.1995). In that case, Ms. Bowman, a Chapter 7 debtor, objected to the trustee's proposed acceptance of a settlement offer on the debtor's pre-petition breach of contract and tortious interference claims. *Bowman,* 181 B.R. at 836. The estate's only asset was the pre-petition civil

action. *Id.* at 845. In approving the trustee's settlement, the Bowman court indicated that "[a] bankruptcy trustee, like a chapter 11 debtor in possession, has a duty to exercise that measure of care and diligence that [an] ordinary prudent person would exercise under similar circumstances." *Id.*, at 843. In *Bowman*, the settlement offer guaranteed payment to all of the estate's creditors, but was not enough for the debtor to realize a return. The trustee initially rejected the offer as too low, but in accepting the same acknowledged that the risk to creditors would outweigh any potential increase in the debtor's distribution. *Bowman*, 181 B.R. at 841. However, Bowman is readily distinguishable as noted therein because the evaluation of a settlement offer in an insolvent Chapter 7 estate is straightforward and the creditors take precedence. *Id.*, at 844.

The Debtor presents a different analogy, the case of *Matter of Central Ice Cream Co.*, 836 F.2d 1068 (7th Cir.1987), involving distributions to shareholders of a corporate debtor after payment of creditors' claims. In *Central Ice Cream*, certain shareholders appealed from a bankruptcy court order approving a settlement agreement with regard to a $52 million judgment the debtor had against McDonald's Corp. McDonald's had moved to set aside the verdict, but offered a $15.5 million in settlement if the debtor accepted the offer before the trial court decided the motion. The amount was sufficient to satisfy all creditors' claims against the debtor and would have left approximately $1 million for the debtor and its shareholders. Several shareholders opposed the settlement, claiming that a 70% reduction from the verdict was excessive, given the apparent likelihood of affirmance of the verdict. The bankruptcy court approved the settlement and certain shareholders appealed to the district court. The district court not only affirmed, but found that the appeal was frivolous and imposed sanctions.

The Seventh Circuit reversed and held that the appeal was not frivolous given the fact that, in negotiating and seeking approval of the settlement, the trustee did not consider the shareholders' interests. The Seventh Circuit stated:

> **The trustee preferred the creditors over the shareholders.** The trustee's counsel ... testified that in negotiating the settlement, he 'did not consider the interest of shareholders.' This is an unusual posture for a trustee, **whose duty is to maximize the value of the estate, not of a particular group of claimants.** Central Ice Cream had assets sufficient to pay all creditors. This made the shareholders the residual claimants; each additional dollar would go to them.... The bankruptcy court should try to implement, rather than alter, nonbankruptcy entitlements.... Both shareholders and creditors have such entitlements.

*Central Ice Cream*, 836 F.2d at 1072 (emphasis supplied, citations omitted). In applying the facts and circumstances in *Central Ice Cream* to the facts in this case, it is clear that not only does the Trustee have a fiduciary duty to the Debtor in his capacity as residual claimant with respect to the proposed settlement, but he is disregarding that duty by not considering the Debtor's residuary interest in any settlement. The proposed amount of settlement would provide just enough to pay the Debtor's creditors and the Trustee's commissions and professional fees, leaving virtually nothing for the Debtor.

The Court has searched the Trustee's papers in vain for a mention of any consideration given to the Debtor's interests in negotiating the proposed settlement. In fact, his entire argument focuses on the effect of the settlement on the Debtor's creditors, with no mention of the Debtor's interests. (Under certain circumstances this may be adequate, but this Court finds it is insufficient under the facts of this case.) Consequently, the Court is constrained to conclude that the Trustee did not discharge his duty of impartiality. *In re Bowman*, 181 B.R. 836, 843 (Bankr.D.Md.1995), *citing*, Daniel B. Bogart, *Liability of Directors of Chapter 11 Debtors in Possession: "Don't Look Back—Something May Be Gaining on You"*, 68 The Am. Bankr.L.J. 155, 216–27 (1994).

In view of our determination that the Trustee overlooked the Debtor's interests in negotiating the global settlement, we have independently and painstakingly reviewed

the possible value of the estate's interest in the Dissolution Action and the Employment Action, in order to be able to balance the equities between the interests of the creditors and the Debtor in this estate.

### The Dissolution Action

As noted earlier, the Dissolution Action was commenced in April 1995 and has been pending for over two years. This litigation is not complex and would not be a protracted affair, since all that is left to do is hold the valuation hearing. Hearings on valuation have been postponed several times, initially, so that the parties could negotiate a settlement and, more recently, to permit this Court to evaluate the settlement for purposes of approving same. Accordingly, no hearing on valuation has been held in any tribunal. Moreover, the valuations submitted in connection with this Motion are unreliable for purposes of valuing either Bambu or the Debtor's shares in the context of a Dissolution Action under the Business Corporation Law. In view of the fact that a forum already exists for a proper hearing on valuation, this Court is loath to accept the parties' assertions as to the value of Bambu. Furthermore, the Court is mindful that all parties agree that Bambu is an enormously profitable entity.

The Court has given due deference to the opinions of the Trustee and the ICC Creditors' Committee, who have pointed out the risk that Bambu's Valuation Report might be adopted by the State Court, resulting in little or no recovery to the non-administrative claimants. The Court has also considered the arguments made by very able and competent counsel advocating the settlement, including the fact that approval of the settlement will bring closure to both this case and the case of Interstate Cigar Co., Inc. However, the Court believes that the estate will do at least as well, and probably considerably better, after a trial than it will by accepting $450,000 in settlement of this action. Pursuant to Bambu's own Valuation Report, the shares are worth between $350,000 and $425,000. It is inconceivable that a court would find the value to be less than that which Bambu itself acknowledges. Therefore, the creditors of this estate appear to be

in a position to recover, at a minimum, a sum close or equal to what is being offered, and perhaps substantially more if the Trustee's Valuation Report and Debtor's position are recognized by the State Court. Essentially, the creditors should not be drastically affected by a fair and impartial finding by a court of competent jurisdiction.

### The Employment Action

The Employment Action was also commenced in April 1995 and has been pending for two years. A motion to dismiss the complaint as to defendants Morgenthau Greenes Goldfarb & Aronauer, P.C. and Alan Sills was granted on December 15, 1995 and no further proceedings have been had since that time. While this litigation is at a more preliminary stage than the Dissolution Action, it does not appear to be too complex, although there are numerous issues of fact and law to be decided. As discussed above, the Court has canvassed the issues and determined that the Employment Action is indeed viable. Even the Trustee is confident that a positive result could be obtained for this estate through litigation of this action. The Court recognizes that it may approve a settlement even if it believes that the Trustee would succeed in the litigation of pending matters. *In re Teltronics Services, Inc.*, 46 B.R. 426 (E.D.N.Y.1984), *aff'd*, 762 F.2d 185 (2d Cir.1985). However, as this action will have a long-term effect on the Debtor's financial future and his ability to provide for his family after his death, as well as an effect on the creditors, and in light of the fact that the Debtor's family has agreed to pay for the litigation costs so that the creditors of this estate will not have to incur additional expense, after balancing the equities between the creditors and the Debtor, the Court rejects the settlement of this action for $250,000.

Finally, in weighing the risk to the creditors versus the benefit to the Debtor, the Court finds that the creditors have less to lose than the Debtor. The Court does not believe that the creditors will be as disadvantaged by a rejection of the settlement as the Debtor may be if the settlement is approved. The Court believes that if the litigation proceeds, the creditors will ultimately receive a

substantial portion, if not 100%, of their claims, whereas if the settlement is approved, the Debtor will receive nothing and lose any possibility of a residual distribution.

### *CONCLUSION*

1. This matter is before the Court pursuant to Fed. R. Bankr.P. 9019.

2. The Court rejects the compromise and settlement, as proposed, as not meeting the standard of being fair and equitable and in the best interests of the estate.

3. On the condition that the Debtor's family funds the cost of the Employment Action, the Trustee, with the aid of the Debtor, shall be permitted to proceed with the Employment Action on behalf of the estate.

Trustee's counsel is directed to settle an Order in accordance with this decision on seven (7) days' notice to all parties having an interest herein.