In re The DREXEL BURNHAM
LAMBERT GROUP, INC., et
al., Debtors.

Michael VAUGHN, William Fertig,
and Elliot Bossen, Plaintiffs,

v.

The DREXEL BURNHAM LAMBERT
GROUP, INC., and Republic National
Bank of New York, Defendants.

Bankruptcy No. 90–10421 (FGC).
Adv. No. 90–6555A.

United States Bankruptcy Court,
S.D. New York.

Dec. 13, 1991.

S.M. Bernstein, Kensington & Ressler, P.C., New York City, for Michael Vaughn, William Fertig and Elliott Bossen, plaintiffs.

M.S. Kirschner, Jones, Day, Reavis & Pogue, New York City, for Official Committee of Unsecured Creditors of Drexel Burnham Lambert Group, Inc.

H.J. Yale, Weil, Gotshal & Manges, New York City, for Debtor, Drexel Burnham Lambert Group, Inc.

## MEMORANDUM OF DECISION ON COMPROMISE AND SETTLEMENT OF CLAIMS

FRANCIS G. CONRAD, Bankruptcy Judge.

Group and three former employees (Plaintiffs) envision the compromise and settlement of an adversary proceeding initiated by the former employees in the Debtors' Chapter 11 case. Group Committee opposes the settlement. A hearing was conducted[1] on Group's Rule 9019 motion,[2] and the matter was taken under advisement.

The motion before us contemplates the resolution of a year-old adversary proceeding triggered by Plaintiffs to declare their rights in an escrow fund. The developing body of that action entails numerous issues of law and fact concerning the nature and extent of Plaintiffs' employment; the terms of the Employment Agreements and Escrow Agreements; the appropriateness and applicability of § 502(b)(7);[3] the nature of the security interest in the escrow funds, if any; and, a pivotal "control issue" about the relationship between the escrow agent and the principal. Its thrust has been extensively briefed and argued twice

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. §§ 157(b)(2)(A). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable to this proceeding by Fed.R.Bkrtcy.P. 7052.

2. Federal Rules of Bankruptcy Procedure Rule 9019(a), *Compromise and Arbitration,* provides:

On motion by the trustee and after a hearing on notice to creditors, the United States Trustee, the debtor and indenture trustees as provided in Rule 2002 and to such other entities as the court may designate, the court may approve a compromise or settlement.

3. 11 U.S.C. § 502(b)(7), *Allowance of claims or interests,* provides:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—
(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
(i) the date of the filing of the petition; or
(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

before two different Judges on subsequent relief from stay and summary judgment motions in this adversary proceeding. The underlying factual quarrels have remained untried; the underlying legal issues have remained undecided; and within the gatherings of argument on these matters, systemic issues have been added. It is an irresolute web of debate that even the most nimble araneid could lose footing in. We believe the operation of bargain here could not have been more appropriate.

Claims compromise is always a favorable notion to Bankruptcy Judges. Litigation is often costly and time consuming. The seeds of potential estate recovery, and ensuing creditor recovery, may become depletive and/or impotent. Reorganization framework may fold. For these reasons, we encouraged the parties to go to the settlement table following our denial of Plaintiffs' summary judgment motion. They obliged us, and here we begin.

Plaintiffs and Group stipulated to a statement of facts prior to the related summary judgment motion, which we reiterate here, in part, for the benefit of the unfamiliar reader.

Group [The Drexel Burnham Lambert Group, Inc.] filed a voluntary Chapter 11 petition with this Court on February 13, 1990. On May 9, 1990 and May 15, 1990, involuntary petitions were filed against Drexel Burnham Lambert Trading Corporation (DBL Trading) and Drexel Burnham Lambert Trade Finance Inc. (DBL Trade Finance). The involuntary cases have since been converted to Chapter 11 cases. On May 29, 1990, Drexel Burnham Lambert Incorporated (DBL Inc.) and 14 of its affiliates (DBL Inc. Entities) each filed Chapter 11 petitions with this Court. And, on June 20, 1990, Drexel Burnham Lambert Government Securities, Inc. (Drexel GSI) also filed its Chapter 11 petition. Various Official Committees to the Drexel debtors were appointed through the Spring of 1990. In the following June, the Drexel debtors were consolidated by the Court for procedural purposes.[4]

Approximately nine months prior to Group's bankruptcy filing, Group and Plaintiffs entered into letter agreements (Employment Agreements). The Employment Agreements commenced May 24, 1989, to run through December 31, 1991, and provided the terms for each Plaintiff to work for DBL Inc. in its convertible bond department. (Stip. Facts ¶ 5). The compensation under the Employment Agreements consisted of three components that vary in detail among the Agreements but essentially provided for: (a) a "special bonus" due at the commencement of the Employment Agreements; (b) salary; and, (c) a "guaranteed bonus" payable in increments throughout the 31 month term of the Employment Agreements. (Stip. Facts ¶ 6). Simultaneous with the execution of the Employment Agreements, Plaintiffs, Group, and DBL Inc. entered into Escrow Agreements, naming DBL Inc. as the escrow agent, which were designed to secure the payment of Plaintiffs' guaranteed bonuses in the event DBL Inc. failed to pay. (Stip. Facts ¶ 8, ¶ 9). Promptly following the execution of the Escrow Agreements, Group funded three separate escrow accounts, maintained by DBL Inc. as escrow agent, for each of the Plaintiffs. The escrow agent then purchased one-year Treasury Bills with the funds. (Stip. Facts ¶ 10). Under the terms of the Employment Agreements, Group would receive all interest payments from the escrow accounts. The aggregate principal amount in the escrow accounts at the commencement of Plaintiffs' employment was $13,722,000. (Group's Motion for Order Authorizing and Approving Compromise and Settlement, p. 4; Memorandum of Group Committee in Opposition to Compromise and Settlement, p. 5). Under the terms of the Employment Agreements, Escrow Agreements, and underlying escrow arrangements, each Plaintiff has a valid, perfected security in the collateral in his respective escrow account. (Stip. Facts ¶ 11).

Three days after Group's bankruptcy filing (February 16, 1990), Plaintiffs' employ-

---

**4.** In addition, Drexel Burnham Lambert Realty Inc. filed for Chapter 11 relief on January 23, 1991. Realty is not jointly procedurally administered.

ment was terminated by DBL Inc. (Stip. Facts ¶ 13). On March 6, 1990, Plaintiffs' attorney wrote to Group and DBL Inc. demanding the amounts due Plaintiffs under the terms of their Employment Agreements and Escrow Agreements. (Stip. Facts ¶ 14). Commencing March 1, 1990, the next payment date under the terms of the Agreements, through to the present, Plaintiffs have not received any portion of their salaries or guaranteed bonuses. (Stip. Facts ¶ 15). In early March, 1990, Plaintiffs also commenced a civil action against DBL Inc. in the United States District Court for the Southern District of New York to prevent DBL Inc. from commingling the escrow funds, to impose constructive trusts in the escrow funds, and to declare Plaintiffs' rights in and to the escrow funds. (Stip. Facts ¶ 17). During the pendency of the District Court litigation, and by agreement of the parties, DBL Inc. resigned as escrow agent, and was succeeded by the Republic National Bank, which presently holds one-year Treasury Bills in the escrow accounts as collateral for the guaranteed bonuses. (Stip. Facts ¶ 18). Republic National Bank has not paid Plaintiffs any amounts from the escrow funds. (Stip. Facts ¶ 20). On September 25, 1990, Bankruptcy Judge Buschman denied Plaintiffs' motion for relief from the automatic stay to proceed with their District Court action, and thereafter, Plaintiffs discontinued their District Court action without prejudice. (Stip. Facts ¶ 21).

On October 18, 1990, Plaintiffs filed an adversary proceeding against Group to recover the escrow funds. Plaintiffs also timely filed several proofs of claims for the balances of their guaranteed bonuses in escrow. Group timely answered on December 7, 1990. (Stip. Facts ¶ 22, ¶ 23). Group denied Plaintiffs were entitled to any recovery on their claims and asserted that even if Plaintiffs were entitled to a recovery, such liability was subject to the limitations of § 502(b)(7), and that any claim would also be limited to such distributions as provided for under a confirmed plan. Further, Group answered that, assuming *arguendo*, Plaintiffs have a valid, enforceable, first priority lien securing allowed claims against Group, Plaintiffs have failed to state a claim to entitlement to their asserted collateral. (Group's Answer to Amended Complaint, pp. 6 & 7).

On March 8, 1991, Plaintiffs filed a Motion for Summary Judgment requesting immediate receipt of the amounts remaining of their guaranteed bonuses since the termination of their employment in February of 1990. Plaintiffs' contention was that the Escrow Agreements between Group, DBL Inc., as escrow agent, and Plaintiffs are not employment agreements for purposes of § 502(b)(7); and second, that Group was merely the guarantor of the obligations of DBL Inc. and, as such, cannot directly avail itself of the statutory limitation. Group responded in opposition arguing that Plaintiffs worked for Group, but that even if DBL Inc. employed the Plaintiffs, Group nonetheless obtained the benefit of the one-year statutory cap. In addition, Group asserted, Plaintiffs are not entitled to receive payment of their claims in advance of the other creditors because the collateral securing the guaranteed bonuses is property of the estate. (Response of Group in Opposition to Motion for Summary Judgment, p. 2).

On April 25, 1991, we denied the Summary Judgment Motion finding material issues of fact in dispute, and scheduled an evidentiary hearing for June 7, 1991. At that time, we observed, that for purposes of a § 507(b)(7) application, it was necessary to determine whether Plaintiffs worked for Group or for DBL Inc. We also raised query about the nature and extent of Plaintiffs' services and compensation. We concluded:

> The crux of this matter ... is not based on Plaintiffs' entitlement to a damage claim, but solely upon the method which is to be used in calculating the damage claim.

> On that basis, I think you're going to have to go through ... an evidentiary hearing determining the parties' relationship for the purposes of § 507(b)(7).

> I think that's absolutely in dispute here, and I don't think we really know the

nature and extent of their service and their compensation.

All of you are in agreement on a number of salient facts. It still requires a determination governing the parties' relationship, and I think that's still hotly contested between all the parties here.

On that basis alone I don't think you're entitled to summary judgment.

. . . . .

I'm not so sure who had exclusive control over the terms and conditions and performance of [Plaintiffs'] employment here ... and on that basis I also deny your request for a payment....

. . . . .

I would suggest that you all sit down and decide who [Plaintiffs] worked for and come up with a settlement to get some of this money out to your client now as opposed to two years from now.

(April 25, 1991 Transcript, pp. 11–13).

Settlement negotiations ensued. Group and Plaintiffs agreed to a Stipulation that will dismiss the adversary proceeding, and any and all controversies between the parties arising out of the Employment and Escrow Agreements will be resolved. The Stipulation was presented to the Steering Committee[5] in July, 1991. At that meeting, Group Committee raised questions concerning the proposed settlement. As a result, the Steering Committee did not take any action on the proposed settlement and, instead, directed Group Committee to research and report back about its concerns.

On September 12, 1991, Group requested an in camera status conference with this Court because no action had been taken by Group Committee after two months had passed. At that time, Group Committee noted its objection to the proposed settlement. As a result of the concerns expressed by Plaintiffs' counsel over the amount of time that had passed since the proposed settlement was reached without any further action, we directed that the settlement be presented by motion and

heard on September 26, 1991. As of the date of hearing, there was no formal action taken by the Steering Committee. Nor were any objections issued at hearing by any party other than that of Group Committee.

The status of the escrow funds in the Republic National Bank escrow account, as of December 31, 1990, is as follows:

Plaintiff Vaughn—

1) Balance in escrow account is $4,997,-500;

2) Amount of guaranteed bonus he would have earned over the remaining 22 months of his employment agreement is $4,216,666.67, exclusive of interest and offsets, if any;

3) Amount of compensation he would have earned during the year following his termination is $2,500,000, of which $2.3 million is guaranteed bonus and balance is salary.

Plaintiff Fertig—

1) Balance in escrow account is $3,318,-340;

2) Amount of guaranteed bonus he would have earned over the remaining 22 months of his employment agreement is $2,933,333.33, exclusive of interest and offsets, if any;

3) Amount of compensation he would have earned during the year following his termination is $1,750,000, of which $1.6 million is guaranteed bonus and balance is salary.

Plaintiff Bossen—

1) Balance in escrow account is $2,278,-860;

2) Amount of guaranteed bonus he would have earned over the remaining 22 months of his employment agreement is $1,787,500, exclusive of interest and offsets, if any;

3) Amount of compensation he would have earned during the year following his termination is $1,100,000, of which

5. The Steering Committee is an organization comprised of all the Official Drexel Committees designed to, in addition to other concerns, review proposed settlements arising in the Drexel bankruptcy proceedings. The Steering Committee is not a § 1102 Committee.

$975,000 is guaranteed bonus and balance is salary.

(Stip. Facts ¶ 24, ¶ 25, ¶ 26).

Based on these figures, we can approximate that the aggregate total balance in the escrow accounts is $10,594,700. The aggregate total amount of guaranteed bonuses remaining under the life of the employment agreements is $8,937,500. And the aggregate total compensation for a one-year cap period following Plaintiffs' termination is $5,350,000; $4,875,000 of which represents guaranteed bonuses, the remainder being salary.

From Group's perspective, the cardinal hazard to the proceeding is whether the one-year cap under § 502(b)(7) applies to Plaintiffs' recovery of the escrow funds if the Escrow Agreements are not found to be employment contracts, and if DBL Inc., rather than Group, is found to be the employer. If the Court, after trial, determined § 502(b)(7) did not apply, Group would be utterly defeated. Group's downside risk here is over $10 million.

From Plaintiffs' perspective, the best they could achieve under this suit is the immediate payment of an approximate $9 million aggregate secured claim, plus interest at an annual rate of 9%. At worst, they would hold an unsecured claim aggregating approximately $5.3 million. (Plaintiffs' Response to Group Committee's Opposition to Settlement, pp. 7 & 8).

For settlement purposes, Plaintiffs agreed not to press their claims beyond the one-year cap of § 502(b)(7). Plaintiffs also agreed to compute the one-year cap based solely on the guaranteed bonuses rather than on the bonuses and salary. The latter sum was agreed to be treated as a general unsecured claim rather than part of Plaintiffs' secured claim.

The settlement provides that each Plaintiff will be deemed to hold an allowed, oversecured claim against Group equal to 85% of one year's bonus, totalling in aggregate $4,143,750. The allowed amount of each claim will earn interest at the annual rate of 6.6% from February 13, 1990 to the date of payment. The remaining amount in the escrow accounts, $6,450,950, will revert to the Group estate. Under the settlement, the Plaintiffs shall also be deemed to hold an allowed non-priority unsecured claim in the full amount of one year's salary. Collectively, those salaries are $475,000. Upon consummation of the settlement, Plaintiffs will waive any further claims to the escrow fund and will discontinue the adversary proceeding with prejudice.

Group Committee opposes this settlement saying that Plaintiffs have already been paid enough. Group Committee believes the settlement is not in the best interests of the creditors of the debtor estates, is neither fair nor reasonable, and charges that Group could do no worse after trial than it is doing in the settlement, and would be, in fact, likely to prevail at a trial and pay nothing.

The genesis of Group Committee's opposition rises from its conviction that the escrow funds are unsecured. Such is captured in three tiers of argument. First, Group Committee argues that because § 502(b)(7) bars recovery beyond one year, this proceeding does not involve Plaintiffs' right to a $9 million fund, but only to a $5.3 fund; thus, a proposed settlement amounting to a $4,143,750 recovery plus interest, together with payment of an additional $475,000 in salaries, is not a compromise at all, "but a complete capitulation for no apparent reason." (Memorandum of Group Committee in Opposition to Compromise and Settlement, pp. 2 & 3).

Second, Group Committee resurrects the "control issue" regarding the relationship between Group, DBL Inc., and Plaintiffs, and contends that DBL Inc. fails the independence and neutrality test required for a valid escrow to have been formed under New York law. Moreover, Group Committee claims that even if the escrow agreement is valid, the security interest was unperfected because possession by DBL Inc. does not provide notice to creditors.

Third, assuming, *arguendo*, that a valid security agreement was created and the security interest was perfected, Group Committee suggests that the transfer of the security interest from Group's estate to

Plaintiffs, to secure their employment compensation, was fraudulent.

Group Committee concludes that "the issues are not complex, and a trial on this matter can be accomplished expeditiously" with "a high probability of success on the merits" and comparatively small litigation costs. (Memorandum of Group Committee in Opposition to Compromise and Settlement, p. 4).

■■■ F.R.Bkrtcy.P. Rule 9019 empowers the Bankruptcy Court to approve compromises and settlements if they are in the best interests of the estate. *See, In re Energy Cooperative, Inc.,* 886 F.2d 921, 19 BCD 1443, 22 CBC.2d 1224, CCH Bankr. L.Rptr. ¶ 73163 (7th Cir.1989). A decision to either accept or reject a compromise and settlement is within the sound discretion of the Court, *see, In re Neuman,* 103 B.R. 491, 19 BCD 1380, 21 CBC.2d 778 (Bkrtcy. S.D.N.Y.1989), *rev'd on other grounds,* 124 B.R. 155, 21 BCD 587, CCH Bankr.L.Rptr. ¶ 73794 (S.D.N.Y.1991), and although we may consider a creditor's objection to the proposed compromise, the objection is not controlling, and will not bar approval, *see, In re Bell & Beckwith,* 93 B.R. 569 (Bkrtcy.N.D.Ohio 1988), when a review of the settlement shows it does not "fall below the lowest point in the range of reasonableness." *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), *quoting, Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972), *cert. denied sub nom., Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). When assessing a compromise and settlement, we are not obliged to determine and rule upon disputed facts and questions of law, but rather only to "canvass" the issues. *In re W.T. Grant Co., supra,* 699 F.2d at 608. A trial or "mini trial" on the merits is not required. *In re Blair,* 538 F.2d 849, 851 (9th Cir.1976). Further, the Court need not conduct a wholly independent investigation in formulating its opinion as to the reasonableness of a settlement. We may give weight to the informed judgments of the trustee or debtor-in-possession and their counsel that a compromise is fair and eq-

uitable, *see, In re Carla Leather, Inc.,* 44 B.R. 457 (Bkrtcy.S.D.N.Y.1984), *aff'd,* 50 B.R. 764 (S.D.N.Y.1985), and consider the competency and experience of counsel who support the compromise. *See, In re Texaco,* 84 B.R. 893, 17 BCD 483, 18 CBC.2d 1099 (Bkrtcy.S.D.N.Y.1988); *In re International Distribution Centers, Inc.,* 103 B.R. 420 (S.D.N.Y.1989). And indeed, a Court may approve a settlement even if it believes that the trustee or debtor-in-possession ultimately would be successful at trial. *In re Teltronics Services, Inc.,* 46 B.R. 426 (E.D.N.Y.1984), *aff'd,* 762 F.2d 185 (2d Cir. 1985). Finally, we must consider the principle that "the law favors compromise." *In re Blair, supra,* 538 F.2d at 851.

As evidenced, *supra,* there is a mass of opinions to be found that have dealt with the determination of reasonableness in compromise and settlement. Our initial guidance generates from the Supreme Court's holdings in *Protective Committee for Independent Stockholders of TMT Trailor Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). In *TMT,* the Supreme Court set forth the methodology to be applied in determining whether or not a Court should approve a compromise and settlement. That Court stated:

> [A Bankruptcy Judge should] apprise himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties in collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

*Id.,* 88 S.Ct. at 1163–64. From this axiom, the Courts have established uniform standards, or factors, to be considered when deciding a Rule 9019 motion: (a) the probability of success in the litigation; (b) the difficulties in collection; (c) the complexity of the litigation, and the expense, inconvenience, and delay necessarily attending it; (d) the paramount interest of the creditors

and a proper deference to their reasonable views.

■ On this subject, Bankruptcy Judge Schwartzberg, in *In re Texaco, Inc.*, 84 B.R. 893, 17 BCD 483, 18 CBC.2d 1099 (Bkrtcy.S.D.N.Y.1988), tendered a sane and comprehensive account of the Court's role in determining reasonableness. Judge Schwartzberg issued the following sentiments and broadened the list of (*TMT*) factors:

> The terms "equity" and "fairness" are not only terms of art in bankruptcy; they are catch words of bankruptcy law in general. Equitable considerations should be preeminent in the exercise of bankruptcy jurisdiction. Decisions as central to bankruptcy proceedings as approval of settlements cannot be visceral. They must issue from reason and rest upon factual undergirdings
>
> A court should consider the following factors in reaching its ultimate decision to approve a compromise and settlement:
>
> 1) The balance between the likelihood of success compared to the present and future benefits offered by the settlement;
>
> 2) Prospect of complex and protracted litigation if settlement is not approved;
>
> 3) Proportion of the class members who do not object or who affirmatively support the proposed settlement;
>
> 4) The competency and experience of counsel who support the settlement;
>
> 5) The relative benefits to be received by individuals or groups within the class;
>
> 6) The nature and breadth of releases to be obtained by officers and directors; and
>
> 7) The extent to which settlement is the product of arm's length bargaining.

*Id.*, 84 B.R. at 902 (Citations omitted). We do not deem this list exhaustive, but it is complete for the memorandum.

■ As we noted earlier, the action between Group and Plaintiffs began over 18 months ago; the issues have been weighed, briefed, and argued in two previous Court proceedings; the litigation to date has resolved none of the underlying disputes. Notwithstanding Group Committee's statements to the contrary, this action is fraught with convoluted issues, and would indeed present a complex course for determination. At hearing on the summary judgment motion, we stated that given the numerous factual and legal issues in dispute, the proceeding could not be resolved upon motion, but must be tried. Again, with due deference to Group Committee, we do not believe a trial on this matter could be accomplished either expeditiously or inexpensively. But the time and expense that would be required to try this proceeding is not the determinative consideration here; rather, it is the risk factor to each party that is most significant.

This Judge, succeeding retired Bankruptcy Judge Buschman, has presided over the Drexel bankruptcies in the Southern District of New York for over a year now.[6] Over that period of time, we have come to know these bankruptcy cases very well. We have also come to know counsel for the Drexel debtors very well. They have consistently demonstrated to this Court a dedication to the best interests of the Drexel debtor estates. We know all counsel has investigated and analyzed their risks in litigating this action with utmost diligence. We know of no reason to find this settlement has not been fully examined and fairly bargained for.

Group Committee's arguments concerning the validity of the escrow funds and the attaching security interest, as well as the fraudulant transfer issue, lend support to the risks Plaintiffs face at trial.

We, ourselves, at the summary judgment hearing, determined there was no clear "slam dunk" on either side when we suggested settlement to the parties.

Whether Group or Plaintiffs would triumph after litigation is not the issue. Rather, given the numerous unresolved factual and legal issues, and the risks to

---

**6.** On February 19, 1991, the District Court for the Southern District of New York (Pollack, D.J.) withdrew the reference of the Drexel debtors' bankruptcy cases. The District Court further directed that all core matters be adjudicated in the Bankruptcy Court.

each party in the event of an adverse outcome, the question is whether the decision to settle is reasonable. The settlement, as proposed, represents an approximate $^{60}/_{40}$ split of a $10 million pot.

We note that no other Official Committee to the Drexel debtors objected to the proposed settlement. We have considered Group Committee's objection. The interests of Group's unsecured creditors (represented by Group Committee) is, of course, to obtain the maximum recovery possible for the Group estate. Not approving this settlement would benefit the unsecureds only to the extent that the prospective recovery would be greater than that which is offered by the settlement. This is an entirely speculative and unpredictable prospect.

Further, based on the record of this action to date, and the fact that it is obvious extensive arm's length negotiations between the parties have been conducted over a significant period of time, it is evident that a more favorable settlement to Group (and the unsecureds) cannot realistically be reached.

In conclusion, based on all the information available, this Court believes that the proposed settlement is fair, equitable and reasonable, and in the best interests of the estate.

Counsel for Group is to settle an Order.