In re **INTERSTATE CIGAR CO., INC.,** and as Successor by Merger to L.S. Amster & Co., Inc., Debtor.

Committee of Unsecured Creditors of Interstate Cigar, Co., Inc., and as Successor by Merger to L.S. Amster & Co., Inc., Plaintiff,

v.

Interstate Cigar Distribution, Inc., and Congress Financial Corporation, Defendant.

Bankruptcy No. 890–91248–478. Adversary No. 890–8249–478.

United States Bankruptcy Court, E.D. New York.

Nov. 8, 1999.

---

J. Ted Donovan, Teitelbaum, Braverman & Borges, P.C., New Hyde Park, NY, for the Official Committee of Unsecured Creditors.

Frank S. Occhipinti, Stewart, Occhipinti & Makow, LLP, New York City, for the "Hermans".

Randolph White, Pryor & Mandelup, Westbury, NY, for Gary Lefferts, et al.

Jeffrey N. Rich, Winick & Rich, New York City, Mediator.

MEMORANDUM DECISION DENYING APPLICATION BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO APPROVE SETTLEMENT OF CLAIMS WITH CONGRESS FINANCIAL CORP.

DOROTHY EISENBERG, Bankruptcy Judge.

This matter is before the Court pursuant to an application of the Official Committee of Unsecured Creditors (the "Committee") of Interstate Cigar Co., Inc. (the "Debtor"), for an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a "Settlement Agreement and Re-

lease" (the "Settlement") dated March 11, 1999 between the Committee and Congress Financial Corporation. Certain creditors of the Debtor who hold the single largest claim in the estate (defined below as the "Hermans") object to the Settlement as being neither fair nor equitable, nor in the best interest of the bankruptcy estate. After hearing the arguments and testimony, and reviewing the relevant pleadings and case law, and based on the findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules as hereinafter stated, the Court denies the motion to approve the Settlement.

## FACTS

On March 7, 1990, the Debtor entered into an Asset Purchase and Sale Agreement (the "Purchase Agreement") with Interstate Distribution, Inc. ("IDI") pursuant to which IDI would purchase certain assets consisting principally of all inventory and accounts receivable (the "Transferred Assets") from the Debtor's health and beauty aid division. CIT/Group/Factoring Manufacturer's Hanover ("CIT") had a pre-existing, valid, perfected security interest in the Transferred Assets at the time that the Purchase Agreement was entered into. Specifically, the consideration for the Purchase Agreement consisted of:

(i) Payment to CIT in the sum of $18,-258,238.43, in exchange for which CIT released its lien in the assets transferred;

(ii) Assumption by IDI and payment by IDI of certain selected accounts payable of the Debtor in the sum of $7,383,217;

(iii) Execution by IDI of a promissory noted dated March 7, 1990 in the principal sum of $1,800,000 payable in five years with interest payable quarterly by IDI at ten percent interest per annum;

(iv) Assumption by IDI of certain leases of real and personal property and contracts to which the Debtor was a party; and

(v) Issuing to the Debtor 3,000 shares of Series B convertible preferred stock of IDI.

At closing CIT was owed approximately $21,658,238.43 and agreed to release its liens on the assets transferred in consideration for a cash payment of $18,250,238.43. The Debtor executed a promissory note to CIT in repayment of the balance of the monies due. To secure payment under the note, the Debtor granted CIT a security interest in the Debtor' stock in its subsidiary, Austin Drugs. Following the closing, IDI paid approximately $7 million to certain creditors of the Debtors. Other creditors, whose support was not deemed necessary for IDI's ongoing operations, received nothing as a result of the sale.

Congress Financial Corporation ("Congress") financed IDI's acquisition of the assets in question by wire transferring $18,250,000 directly to CIT in exchange for CIT's release of its security interest. As part of the loan documents, executed simultaneously with the Agreement, IDI executed both a security agreement (the "Security Agreement") and a second document entitled "Additional Representations, Covenants and Other Terms Supplemental to Accounts Financing Agreement" (the "Supplemental Security Agreement") in favor of Congress. By virtue of these documents, Congress acquired a security interest in all the assets transferred from the Debtor to IDI.

There was no notice of the sale to Debtor's creditors which is required by the New York Bulk Sale Law. IDI knew of the non-compliance with the bulk sale statutes, and the Purchase Agreement waived compliance with the bulk sale statutes, and provided that the Debtor would indemnify IDI for any damages arising from litigation under the bulk sale laws. Paragraph 2(j) of the Supplemental Security Agreement provided that delivery of the Agreement was a condition precedent to Congress's financing the transfer between the

Debtor and IDI. The Purchase Agreement was assigned to Congress pursuant to para. 7 of the Supplemental Security Agreement. Para. 7 of the Supplemental Security Agreement specifically assigned to Congress all of IDI's right, title and interest to IDI's indemnification rights with respect to the parties' failure to comply with the bulk sale laws. Para. 7 provides as follows:

7. *Collateral Assignment of Purchase Agreement.* As further security for the prompt performance, observance and payment in full of all obligations, we hereby grant to you a continuing security interest in, a lien upon and right of set-off against and we hereby assign, transfer, pledge and set over to you all our right, title and interest arising from or in connection with the purchase agreement, including without limitation any rights to or claims under any indemnification provisions whether for bulk sale compliance or otherwise. We agree that such right, title and interest assigned shall be deemed a part of the collateral under the financing agreement and the other supplements thereto.

Throughout the course of IDI's existence, Congress applied proceeds from the sale of the collateral to Congress's loan balance. After liquidating substantially all of the collateral acquired from the Debtor, IDI went out of business in early 1991. By this time, IDI had paid to Congress all of the principal and a portion of the interest totaling at least $19,391,800 on its credit line. The interest collected by Congress totaled at least $1,200,000. After operations ceased, IDI auctioned off its remaining assets and paid the proceeds of the sale to Congress. The unsecured creditors of IDI remained unpaid, and likewise, the unsecured creditors of the Debtor were left with claims in excess of $15 million, with no assets of the Debtor remaining to satisfy the claims.

The Debtor's case began as an involuntary proceeding under Chapter 7 of the Bankruptcy Code. The Debtor consented to jurisdiction thereafter, and on June 7, 1990, the case was converted to a case under Chapter 11. The Court issued an order on August 24, 1990, authorizing the Committee acting as Plaintiff on behalf of the Debtor's estate, to commence an action against IDI and Congress (the "Bulk Sale Action"). The Committee commenced the Bulk Sale Action in the Bankruptcy Court and in the Supreme Court for Nassau County. After contested motions to remand, this Court remanded the case to the Supreme Court for Nassau County, and on November 19, 1991, the Court entered an order providing that following the State Court's determination of liability, the action would be removed to the Bankruptcy Court to permit this Court to fashion a remedy.

Thereafter, the Committee counsel added as defendants the officers, directors and shareholders of the Debtor and IDI. A second amended complaint was served in the Bulk Sale Action, and Nancy Spielfogel, Sarah Spielfogel, Joel Spielfogel, Sandra Spielfogel and Lawrence C. Aaronson were added as defendants (the "Individual Defendants"). The Committee asserted that the Individual Defendants were liable as a result of the alleged fraudulent conveyance of the Debtor's assets to IDI. The Second Amended Complaint in the Bulk Sale Action set forth four causes of action: (1) against all defendants to set aside a bulk transfer of the Debtor's assets as violative of New York Uniform Commercial Code ("U.C.C.") Sections 6–104 and 6–105; (2) against all defendants for damages as a result of an alleged fraudulent transfer of the Debtor's assets; (3) against IDI to set aside the alleged fraudulent transfer; and (4) against Congress to set aside the fraudulent transfer and to have Congress's lien in the transferred assets declared void as a result of the alleged U.C.C. violations.

The Individual Defendants moved to dismiss the Second Amended Complaint, which motion was partly denied and partly granted with respect to the Plaintiff's Second Cause of Action. The Individual Defendants appealed from the Trial Court's Order denying their motion to dismiss, and the order was overturned on appeal by Order of the New York Appellate Division, Second Department dated December 12, 1994. The Appellate Division found that the bulk sale statute "does not create a cause of action to recover damages for conspiracy or tortious inducement to violate the bulk sale law" and found that "the sections of the debtor and creditor law [Sections 278, 279] do not, either explicitly or implicitly, create a creditors' remedy for money damages against parties who are neither transferees of the assets nor beneficiaries of the conveyances . . ." *Committee of Unsecured Creditors of Interstate Cigar Co. v. Interstate Distribution, Inc.,* 210 A.D.2d 283, 620 N.Y.S.2d 78, 80 (2nd Dept. 1994).

In March 1993, Congress moved for summary judgment on the First and Fourth Causes of Action, alleging that the transaction between the Debtor and IDI was excepted from Article 6 of the U.C.C. governing bulk sales pursuant to U.C.C. Section 6–103(3), which excepts "transfers in settlement or realization of a lien or other security interests". The Committee cross-moved for partial summary judgment on the First Cause of Action alleging a bulk sale violation only against the non-moving Defendant, IDI. The State Court by order dated July 23, 1993, denied Congress's motion for summary judgment, finding as follows:

> As to Congress's motion the Court finds that a question of fact exists as to whether Congress knew of the alleged fraudulent transfer and lent money in furtherance of the alleged fraudulent transfer. In so doing the Court notes that if the allegations of the Plaintiff that additional consideration was paid on the bulk sale beyond that of the alleged

security interest on the assets the exemption of Article 6, Section 6–103(3) of the U.C.C. would not apply herein.

At the time the motions for summary judgment were pending, Gerald Herman, Steven Herman, Susan Lefferts, Gary Lefferts and Robert Botwinick (collectively, the "Hermans") entered into negotiations with the Committee over their claim against the Debtor. The Hermans are former minority shareholders and creditors of the Debtor. They collectively hold the largest pre-petition claim against the Debtor in the aggregate amount of approximately $8 million, inclusive of interest. The Hermans' claims arose from the settlement of state court litigation against the Debtor, two affiliates, L.S. Amster & Co., Inc. ("Amster"), and Bambu Sales Corp. ("Bambu") and the controlling shareholders of these corporations, the families of Michael and Sidney Spielfogel. The settlement of the state court litigation prior to trial took place over one year prior to the involuntary petition filed against this Debtor. The Committee and the Hermans agreed to compromise the Hermans' claim pursuant to a settlement dated June 23, 1994 (the "Herman Settlement Agreement"). Pursuant to the settlement terms, the Hermans, under the belief that there was a valuable cause of action on behalf of the Debtor against Congress *et. al,* accepted fifty percent of all amounts recovered under the Bulk Sale Action, in excess of $200,000 and net of attorney's fees incurred in the litigation. In exchange, the Hermans waived any right to a distribution from other monies in the bankruptcy estate. As a result of entry into the Herman Settlement Agreement, the payment of the Hermans' claim became tied directly to the outcome of the Bulk Sale Action. Apparently, the Committee and the Hermans were optimistic at the time of the settlement that the Bulk Sale Action could generate sufficient funds to satisfy the claims of the Hermans at least in part. The Hermans further offered to prosecute the Bulk Sale Action, at no cost to the Committee, which the Committee refused,

which further supports the contention that the Committee believed that the Bulk Sale Action had some merit.

Throughout the time that the Bulk Sale Action was being litigated, the Hermans had been consulted by the Committee regarding strategy and was kept abreast of new developments. The case was placed on the trial ready calendar, and at the point at which a trial was to be scheduled, Congress suggested that the parties engage in non-binding mediation. The Committee counsel advised counsel to the Hermans that Congress had suggested mediation. Counsel to the Hermans told counsel to the Committee that they opposed mediation as it would delay the resolution of the case, but despite the Hermans' disagreement, the Committee and Congress entered into mediation.

Jeffrey N. Rich, Esq., of the law firm of Winick & Rich, P.C. was selected to mediate the Bulk Sale Action. While the Hermans did not object to Mr. Rich's skills as a lawyer, the Hermans questioned whether Mr. Rich would be an appropriate mediator given the nature of the case, as the law firm of Winick & Rich, P.C. primarily represent the interests of banks and financial institutions. According to the Hermans, this should have disqualified Mr. Rich as a mediator in this case. After hearing the Committee's case and Congress' case, Mr. Rich recommended a settlement in the approximate amount of $200,000 in favor of the Committee. Despite the Hermans' opposition to the mediator's proposal, counsel to the Committee accepted the proposal and worked out the details with Congress.

The terms of the settlement to be passed on by the Court are as follows: Congress is to pay the sum of $200,000 to the Committee. Congress is also waiving all claims it has for itself or as assignee of IDI against the Estate. As a result, funds in the approximate amount of $159,000, which are being held in escrow on behalf of the potential claims of Congress, shall be released, netting a settlement amount of $359,000. In determining to accept the settlement, the Committee focused on a number of factors. These factors include: (a) the strength of the case against Congress; (b) Congress' counterclaim against the Debtor's estate; (c) the impact of a prior settlement with the Herman family on any recovery against Congress; and (d) the length of time involved and the legal cost and expense which would be incurred in continuing the litigation. Under the Committee's analysis, there is no doubt that a bulk sale occurred, and there was no notice of the bulk sale given to creditors of the Debtor. Furthermore, IDI and Congress knew of the non-compliance of the bulk sale statute. In fact, the Debtor agreed to indemnify IDI for any damages arising out of the litigation under the bulk sale laws, which rights were assigned to Congress. As Congress knew of the non-compliance of the statutes, the Committee asserts that Congress is subject to the part of the bulk sale law which holds a subsequent purchaser with knowledgeable of the bulk sale violation liable as well. According to the Committee, Congress is to be treated the same as a subsequent purchaser with knowledge because U.C.C. Section 1–201(32) defines a purchase as including "taking by sale, discount mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property."

Congress, however, asserts that either the bulk sale law does not apply, or if it does apply, there was no resulting injury to the creditors due to the violation of the bulk sale law. Congress appears to be relying on New York UCC Section 6–103 which provides that transfers or settlement or realization of a lien or other security interest are not subject to the bulk sales law. According to Congress, the wire transfer of $18,250,000 by Congress to CIT in satisfaction CIT's lien constituted the "settlement of the security interest." In addition, Congress asserts that the Committee could not show any damages as a result of the closing of the asset transfer. The Creditors' Committee

had no security interest in any assets transferred pursuant to the Purchase Agreement. Therefore, the rights of the unsecured creditors were, prior to the Purchase Agreement, subordinate to the Debtor's secured lender, CIT. The Debtor's creditors could not have raised a valid objection had CIT taken back the assets securing its loan in satisfaction of its security interest and then transferred those assets to IDI. Congress, by virtue of its payment to CIT and satisfaction of its lien, is subrogated by operation of law to CIT's security interest.

The Hermans oppose the Settlement, claiming that it is unfair and inequitable especially in light of the obligation owed by the Committee to the Hermans under the Herman Settlement Agreement. If the Committee were successful on the Bulk Sale Action, which the Hermans believe will be the case, the Hermans state that the Committee should not place great weight on Congress's claim to share in the distribution from the Debtor's estate on par with other unsecured creditors as it is unlikely that the indemnification claim of Congress will be paid on a parity with other unsecured creditors. Rather, the Hermans believe that there are grounds upon which the Bankruptcy Court will most likely equitably subordinate the claim of Congress if Congress is found liable under the Bulk Sale laws. No one knows whether this is an appropriate assessment of this claim.

## DISCUSSION

■ Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court is authorized to approve compromises and settlements which are deemed fair and equitable and in the best interest of the estate. In the case of approving a compromise or settlement, equitable considerations are paramount in the exercise of the Bankruptcy Court's jurisdiction. The Court's determination under Bankruptcy Rule 9019 must emanate from the facts of the case before the Court. *In re Texaco, Inc.*, 84 B.R. 893,

902 (Bankr.S.D.N.Y.1988). It is within the Court's discretion to accept or reject the compromise and settlement. *In re Drexel Burnham Lambert Group*, 134 B.R. 499, 504 (Bankr.S.D.N.Y.1991).

■ In making its determination, the Bankruptcy Court is charged with canvassing the issues to determine whether the settlement falls below the lowest point in the range of reasonableness. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2nd Cir.1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). In making such a determination, the Court is not charged with holding a mini trial on the merits, but must review the issues which are subject to the settlement. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 504 (Bankr. S.D.N.Y.1991), *quoting In re Blair*, 538 F.2d 849, 851 (9th Cir.1976).

■ As this Court previously stated in *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y.1997), the courts in this Circuit consider the following factors in reaching a decision on a Rule 9019 motion:

(i) The balance between the likelihood of success compared to the present and future benefits offered by the settlement;

(ii) The prospect of complex and protracted litigation if the settlement is not approved;

(iii) The proportion of the class members who do not object or who affirmatively support the proposed settlement;

(iv) The competency and experience of counsel who support settlement;

(v) The relative benefits to be received by individuals or by groups of the class;

(vi) The nature and breadth of releases to be obtained by officers and directors;

(vii) The extent to which the settlement is the product of arms-length bargaining.

*In re Texaco, Inc.,* 84 B.R. 893, 902 (Bankr.S.D.N.Y.1988).

The most critical factors to consider in determining whether to approve the Settlement in this case are (i) the likelihood of success compared to the present and future benefits offered by the Settlement, and (ii) the objections lodged by the Hermans, who stand to lose more than the other unsecured creditors if the proposed settlement is approved by virtue of their having waived payment on their $8,000,000 claim from funds already collected by the Committee.

The legal issue for the State Court to decide is whether Congress, as a lender to IDI, should be held liable for the transfer under the New York Bulk Sales Law. In canvassing this issue, the Court is mindful of the fact that there is very little New York law on the issues presented by the Bulk Sale Action, and there are no cases on point in any jurisdiction. However, the Court can make certain observations regarding the merits of the Bulk Sale Action The New York State Bulk Transfer Laws under Article 6 of the New York UCC, provide as follows:

**Section 6–104**

(iv) Except as provided with respect to auction sales, a bulk transfer subject to this article is ineffective against any creditor of the transferor unless:

a. The transferee requires the transferor to furnish a list of his existing creditors prepared as stated in this section; and

b. All of the property transferred sufficient to identify it; and

c. The transferee preserves the lists and schedules for six months next following the transfer and permits inspection of either and copying therefrom at all reasonable hours by any creditor of the transferor, or files the lists or schedules in the Department of State.

New York Uniform Commercial Code, Section 6–104 (McKinney, 1990).

The Bulk Sales Act was enacted to:

... deal with two commons forms of commercial fraud:

(1) the merchant, owing a debt who sells his inventory to a friend for a bargain price, pays his creditors less than he owes them, hoping to reenter the same business through the back door at a later date; and

(2) the merchant, owing debts, who sells out his stock to anyone at any price, pockets the proceeds and disappears, leaving the creditors unpaid.

*American Metal Finishers, Inc. v. Palleschi,* 55 A.D.2d 499, 391 N.Y.S.2d 170 (1997). An exception of the notice requirement of the Bulk Sales Law is found in Section 6–103 of the Uniform Commercial Code, which provides that: "[t]he following transfers are not subject to this article ...(3) transfers or settlement or realization of a lien or other security interest." It is clear that this was a bulk sale and that there was no notice of the bulk sale. The sale contract in question specifically waived compliance with the bulk sale laws, and provided that the Debtor would indemnify IDI for any damage arising from litigation of the Bulk Sale Law. Delivery of the Purchase Agreement between IDI and the Debtor was a condition precedent of Congress' financing of the bulk transfer between the Debtor and IDI. The agreement was assigned to Congress pursuant to paragraph 7 of the Supplemental Security Agreement. The Vice President of Congress, Steven Stone, testified at his deposition that Congress received a copy of the agreement prior to the closing and read it. Therefore, it seems clear that Congress is charged with notice of Bulk Sale violations and IDI's role in the violations.

Congress asserts that because CIT held a lien on the assets when they were owned by the Debtor, and because the potential value of assets at liquidation would have been insufficient to pay CIT in full, credi-

tors would not have collected even if they would have received timely notice of the bulk sale. Therefore, Congress believes that the Bulk Sale laws do not apply and that if they do apply there was no injury to creditors. In addition, according to Congress, the transaction is exempt from the Bulk Sale requirement because the amount paid over to CIT (approximately $18.5 million) is the sole "cash" consideration. Congress argues that since the remaining consideration, a five year note, preferred stock and an assumption of approximately $8.5 million of the Debtor's debts, were not "cash", the remaining consideration cannot be included in the analysis. While it is difficult to predict how a state court will rule on this issue, the Court does note that Justice McCabe, in denying the motion by the Committee for summary judgment and cross motion by Congress for summary judgment, noted that an issue of fact existed as to whether or not additional consideration was paid beyond the approximately $18.5 million dollars paid to CIT. It is certainly conceivable that a state court could find that the issuance of the five year note and the stock, and the assumption of certain debts at the time of the transaction constituted sufficient additional consideration to render Congress' argument invalid.

The next issue for the State Court to consider would be whether to hold Congress as a lender liable on the transaction when it was not the purchaser of the assets and merely had a lien on the assets. The Committee has pointed to certain provisions in the UCC which a court could interpret to mean that a "purchaser" includes a party which obtains a lien on assets. If a court were to read the definitions in this manner, then Congress could be liable under the same provision that a subsequent purchaser with knowledge of the Bulk Sale violation would be liable. If that were the case, then the remaining issue would be to determine damages.

Although the Committee asserts that damages should be calculated at the full amount of the claim which was not paid (about $14.2 million), they also recognize that a strong argument exists that at best the estate should be limited to its pro-rata share of the $7 million dollars which was paid by IDI to certain creditors of the Debtor, as that is the sum which would have been available for distribution to unsecured creditors had there not been a violation of the Bulk Sale laws. In addition, there is case law suggesting that this figure would be further reduced by deducting the monies which were already recovered from preference actions against creditors who were paid about $2.4 million, which would leave the estate with a recovery of $4.4 million. A further twist to the recovery scenario is that if the Committee wins on its argument, Congress has asserted a claim under the indemnification clause of the sales contract. If the claim is upheld and Congress' claim is not equitably subordinated, Congress would be entitled to a claim for the full amount it must pay the Committee and all of the attorney's fees and costs incurred in the Bulk Sale Action. As a result, if the above scenario came to fruition, Congress would have a claim of about $4.4 million dollars, plus at least $600,000 in legal fees. However, there is certainly a possibility that Congress's claim could be equitably subordinated in this case, especially if another court makes findings that Congress assisted in the perpetration of a wrongdoing.

Although the Committee does not find this potential recovery to be compelling enough to reject the $200,000 settlement, the Court notes that the settlement amount is significantly below the potential recovery, and would in fact provide a net recovery to the estate of approximately $50,000 after the Committee's legal fees are paid. The Court is compelled to find that the settlement amount pales in comparison to the potential value of the litigation, and does not appear to even amount to the lowest reasonable settlement, based on the legal issues presented in this case.

Further, the Court is mindful of the opposition filed by the Hermans. The Hermans, who have the most to lose in the event the Settlement is approved, strenuously object to the Settlement. According to the Hermans, the Committee owes a certain degree of duty to the Hermans pursuant to the Herman Settlement Agreement whereby the Hermans' recovery in the Debtor's estate would be limited to a certain portion of amounts recovered under the Bulk Sale Action, but they receive nothing from the first $200,000 obtained by the Committee. Therefore, the opinion of the Hermans on the Settlement is a substantial factor to take into consideration by this Court. The Hermans believe that the claims of the Committee are completely viable and have requested that if the Settlement is not approved that the Hermans be granted the authority to renew the action at their own cost and expense, subject to the division of proceeds as set forth in the stipulation of settlement between the Hermans and the Committee, which would relieve the Debtor's estate from the direct costs of any further litigation. In addition, as the largest creditors, who previously entered into an agreement in this case in regard to this litigation, the Hermans' opinions play an important role in reviewing this matter. Clearly the Committee owes a duty to all creditors of this estate which includes the Hermans to maximize the bulk sale action.

With regard to the prospect of complex and protracted litigation if the Settlement is not approved, the Committee has argued that in the event they were successful in the State Court action, Congress would most likely appeal and it is highly likely that briefs from other financial institutions would be filed in support of Congress' appeal. This Court does not find that this threat warrants the acceptance of such a low offer, particularly since the Hermans are willing to undertake the cost and expense of litigation on behalf of this estate.

With regard to the competency and experience of counsel who supports the set-tlement, including Mr. Rich, the Court does not find this to be a negative factor. Clearly all counsel have acted in a competent fashion in this case and Mr. Rich's mediation is not to be faulted. However, the appropriate settlement amount as suggested by Mr. Rich is merely his suggestion and as is true of all mediation, it is not binding on the parties or on this Court.

■ The Court is mindful that it must consider the paramount interests of the creditors and give proper deference to their reasonable views. *In re Woodson*, 839 F.2d 610, 620 (9th Cir.1988); *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir.1987). Given the objection by the Hermans who placed their trust in the Committee and find the Settlement to be entirely unacceptable, the Court cannot approve the Settlement. The Court agrees that the action has significant merits and warrants either a higher settlement amount or litigation on the issue in State Court.

In sum, in weighing the factors to be taken into consideration when reviewing the proposed settlement, the Court concludes that there is more harm to the Hermans in approving the Settlement than there is a benefit to the estate. In addition, the Court finds that settling the matter for $200,000 is not within the range of reasonableness under the facts and circumstances of the case.

The Hermans have renewed their offer to continue the Bulk Sale Action at their own cost and expense. The Court finds that such suggestion has merit and directs the Committee to either obtain a higher settlement amount to present to this Court or to turn over the litigation to the Hermans who are willing to fund the litigation costs in pursuit of a favorable outcome of the Bulk Sale Action, utilizing the proper procedure for them to properly represent this estate. The possible exposure to the Debtor's estate amounts to the reasonable legal fees incurred by Congress in defense of the Bulk Sale Action, along with the loss of the settlement amount proposed by

Congress. The risk inherent in this option is far outweighed by the fact that the Hermans will undertake to try the Bulk Sale Action at their own cost and expense, and the creditors will know that the party they believe may have been a party to their non-payment will have been challenged in a court of law. The only real benefit to the estate if the Settlement is approved is that the legal fees of the Committee will be paid with a paltry return to creditors, and the Bulk Sale Action will be concluded. However, the matter is ready for trial and the Court believes that it is in the best interests of the creditors of the estate to deny the Committee's application.

### *CONCLUSION*

1. This matter is before the Court pursuant to Federal Rule of Bankruptcy Procedure 9019. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2. The Court rejects the proposed compromise and settlement, as it does not meet the standards of being fair and equitable and in the best interests of the estate.

3. The Hermans shall be permitted to proceed with the Bulk Sale Action on behalf of the estate, with the Hermans to bear the remaining cost and expense of any litigation. The proceeds shall be distributed pursuant to the Herman Settlement Agreement entered into between the Hermans and the Committee.

4. In the event the Hermans decline to proceed with the Bulk Sale Action, the Court directs that the Committee either propose another compromise for the Court's consideration or continue with the Bulk Sale Action.

Settle an Order on 5 days notice to all parties having an interest herein.