**In re Carlo GARDI and Jeanne Gardi, Debtors.**

**Joseph Gowan, Plaintiff,**

v.

**Carlo Gardi, et al., Defendants.**

**Bankruptcy No. 800–81797–288. Adversary No. 01–08158–288.**

United States Bankruptcy Court, E.D. New York.

Jan. 9, 2002.

Robert Pryor, Pryor & Mandelup, Westbury, NY, for the trustee.

Alan A. Bergstein, Mineola, NY, Special counsel to the trustee.

Kenneth Adler, Melville, NY, for the defendant.

Charles Holster, III, Mineola, NY, for judgment creditor.

Therese Cavanagh, Central Islip, NY, Assistant U.S. Trustee.

## CORRECTED MEMORANDUM OF DECISION GRANTING TRUSTEE'S MOTION TO SETTLE ADVERSARY PROCEEDING

STAN BERNSTEIN, Bankruptcy Judge.

### The Issue:

The trustee has moved for authority to settle a pending adversary proceeding filed against Joseph Gowan under Fed. R. Bankr.P. 9019. After sending the customary notice of the proposed settlement to all parties in interest, the trustee received an objection from a judgment creditor, Carolyn Goodkin (Goodkin), averring that (i) the settlement was not fair or reasonable and not in the best interest of creditors, and (ii) the trustee had failed to present any detailed justification to support the settlement.

The Court held an exhaustive non-evidentiary hearing on this contested motion in which representations and arguments were made by the trustee, the defendant, and the judgment creditor. At the conclusion of the hearing, this contested matter was submitted for decision. For the following reasons, the Court grants the trustee's motion and denies the judgment credi-

**6**

tor's cross-motion.[1]

### Background:

In the fall of 1995, the joint debtors arranged for the private mortgage financing of substantial improvements to their Italian restaurant doing business as Villa Portofino at 2024 Hillside Avenue, New Hyde Park, N.Y. (property). The business itself was operated by a corporation Villa Portofino, Inc., of which Carlo Gardi was the sole shareholder. The private mortgage lender was a local businessman, Joseph Gowan. The "pricing" of this $200,000 loan was written at 16% per annum, the maximum rate of interest allowed under New York State's usury law for loans made to individuals. Gen. Oblig. section 5–501; Banking Law 14–a; *Cohen v. Eisenberg*, 265 A.D.2d 365, 366, 697 N.Y.S.2d 625 (2d Dept.1999). The loan was structured as a non-amortizing five-year term note, with a lump sum payment of principal upon its maturity and with interest to be paid quarterly on the principal balance. This was a second mortgage loan, junior to an existing mortgage lien granted to Transmedia Network, Inc. The co-borrowers of the $200,000 loan were Villa Portofino, Inc., Carlo Gardi, Jeanne Gardi, and their son John Gardi, each jointly and severally liable for the payment and performance of the mortgage note.[2]

In connection with the closing of the loan, the co-borrowers also entered into a two-page agreement (side agreement) in which they agreed to serve the lender and his three guests an unlimited number of meals and drinks on a complimentary basis as long as the restaurant remained open and under the ownership of the co-borrowers. The implied consideration for the co-borrowers' obligation was the lender's promotion of the restaurant.

The entire text of the side agreement (omitting the signature blocks) is as follows:

AGREEMENT made this 14th day of September, 1995, by and between JOSEPH P. GOWAN, JR. (hereinafter referred to as "GOWAN") and VILLA PORTOFINO, INC. its successors and assigns (hereinafter referred to as "PORTOFINO"), JOHN GARDI, CARLO GARDI and JEANNE GARDI, jointly and severally (all hereinafter referred to as "GARDI").

WHEREAS, the parties are desirous of having GOWAN promote PORTOFINO; and

WHEREAS in consideration of services already rendered by GOWAN to PORTOFINO and GARDI, the parties enter this Agreement

NOW in consideration of this Agreement and other valuable consideration it is agreed as follows:

1. GOWAN, at any time shall be entitled to and shall receive, any and all food and drinks at the eating or drinking establishment, located at 2024 Hillside Avenue, New Hyde Park, N.Y., for himself and any guests accompanying GOW-

---

1. The Court does not, however, reach those branches of the judgment creditor's cross-motion to remove the trustee and his special litigation counsel other than to defer ruling on their alleged merits until hearings on applications for final compensation. The decision to defer this ruling was supported by the Assistant United States trustee.

2. There are some internal inconsistencies in the Loan Agreement in that Mr. and Mrs. Gardi are also referred to as guarantors, although there is no separate instrument denominated as "Guaranty." In substance, it is sufficiently clear on the face of the instrument that the Gardis, were intended by Gowan to be personally liable as co-makers, and any ambiguity in the Loan Agreement whether they were primary guarantors must be construed against the draftsman.

AN, not to exceed three (3) guests ("permitted guest"), at no charge whatsoever to GOWAN and his permitted guests, for so long as there is an eating or drinking establishment at 2024 Hillside Avenue, New Hyde Park, N.Y. (hereinafter referred to as "Eating Establishment") owned by PORTOFINO and/or GARDI.

2. GOWAN shall pay any sales tax which may arise from the receipt by GOWAN and his permitted guests of any and all food and drinks at the Eating Establishment, for which there shall be no charge to GOWAN or his permitted guests;

3. This Agreement shall be binding on "PORTOFINO" its successors and assigns, and "GARDI" and their heirs or assigns.

As it turned out, the debtor incurred substantial overruns in completing the construction of the improvements to the restaurant. Moreover, the cash flow from operations was insufficient to meet operating expenses, to pay all subcontractors, and to service the first and second mortgage indebtedness. After the second mortgage note went into default, Gowan initiated a state court foreclosure action. Although the co-debtors' then counsel filed an appearance in the foreclosure action, no defense to the foreclosure action was tendered, and so a default judgment of foreclosure was entered on June 2, 1999. A public sale of the foreclosed premises was scheduled, but to stay the sale, the joint debtors filed for relief in this Court under chapter 11 of the Bankruptcy Code.

During the pendency of the chapter 11 case, the debtors retained new state court counsel to file a motion in the state court foreclosure action in order to vacate the default judgment on the ground that the interest rate on the transaction as a whole violated New York usury law. Before that motion was heard, the Court converted the case filed under chapter 11 to one filed under chapter 7. The reason for the conversion was the failure of the debtors to file a plan of reorganization and the continuing prejudice to creditors arising from the fact that the debtors failed to sell the restaurant and underlying real estate at a price sufficient to satisfy all liens and return some equity to the debtors. After the conversion to chapter 7, the trustee moved to employ the new state court counsel as his special litigation counsel for the estate. In order to reduce the inefficiency of having the bankruptcy case await the outcome of the state court action, the trustee as the successor plaintiff removed the state action to this Court where it was then assigned a new adversary proceeding number.

### The Cross–Motions for Summary Judgment:

Both parties filed cross-motions for summary judgment in the removed action. The trustee pointed out that as the side agreement is drafted, the first "whereas clause" is the only place in the agreement that makes any reference to any express or implied undertaking on the part of Gowan to promote the restaurant. Within the dispositive provisions of the agreement, there is no specific description of any plan or program to promote the restaurant. From this the trustee argues that the only logical inference to be drawn is that Gowan's obligation is illusory, for there is no explicit objective standard or even a benchmark within the confines of the agreement for measuring Gowan's performance (or non-performance). If the lender's obligation to promote the restaurant is on its face illusory, then there is no consideration to support the borrowers' never-ending obligation to provide complimentary meals to the lender and his guests. As such, the agreement is not enforceable.

If, however, the restaurant had, in fact, provided the lender and his guests any complimentary meals and drinks, then the value of these items has to be deemed additional interest on the loan. Since the loan is written at the maximum rate, the payment of any additional interest causes the actual rate to be usurious, and mortgage loan becomes a nullity. The appropriate remedy is for this Court to issue an order avoiding the second mortgage lien, but preserving it for the benefit of estate. Thus, the trustee would step into the shoes of the second mortgagee, and any proceeds of sale of the collateral attributable to that lien would be paid to the estate.

Gowan's cross-motion argued in opposition that the side agreement was an independent agreement that memorialized Gowan's promise to promote the restaurant. Although the side agreement was executed at the closing of the mortgage loan agreement, it stands on its own feet. Gowan's promise to promote the restaurant was bargained in exchange for the co-owners' promise to provide him and his guests with complimentary meals and drinks. As such, the side agreement is valid and enforceable in accordance with its terms, and there is no justification under either state law or equity for deeming the complimentary meals and drinks as additional interest on the $200,000 mortgage loan. As to the transactional history, he recalls that he and his guests were served no more than two meals before John Gardi directed him to stop promoting the restaurant. Gowan further argued that it was the co-borrower's accountant who first suggested the side agreement at the closing. The accountant wanted the corporate borrower to have a written agreement in its business records to justify its taking a deduction for the value of the complimentary meals and drinks to be served to Gowan and his guests. Indeed, it was this kind of analysis that allegedly caused the restaurant's accountant also to insist upon including a provision that obligated Gowan to pay the sales tax on the complimentary meals because the restaurant would not be able to deduct the sales tax.

■ In construing the legal significance of the side agreement, if any, to the loan transaction, the Court would presumably have to take testimony about how many free meals and drinks Gowan or his guests were actually served, what the total retail value of those meals and drinks were, and what efforts Gowan made to promote the restaurant. Assume arguendo that this agreement is a sham. If the total value of those free meals actually provided to Gowan and his guests was less than $500, then this Court might very well conclude that the harm to the estate was *de minimis,* and dismiss the complaint. However strong the public policy is in nullifying usurious loans, there still has to be a rule of reason in applying that policy, given the severity of the remedy. In any event, this Court is not disposed to nullify the loan transaction for $200,000 because an imputed additional interest payment of $500 that would drive the transaction above the usury limit.

Based upon these considerations, the Court orally denied the cross-motions for summary judgment at the hearing on the ground that genuine issues of material fact were raised by the pleadings, the motion papers, the affidavits, and the representations and arguments of counsel. Despite the *repeated* submissions of counsel for the objecting creditor, the Court is not disposed to deny the trustee's motion for authority to settle this dispute by now reconsidering its prior ruling on the summary judgment motions.

The Court would also be remiss if it did not point out that the parties agreed that

the total time it would take to try the complaint was, at the outermost limit, a single day, and more likely less than a half-day. As a matter of judicial economy and practical judgment, it simply made more sense to the Court to schedule this adversary proceeding for trial rather than grant summary judgment to either party— that would have resulted in the long delay occasioned by the appellate process that cannot be justified under any rational cost-benefit analysis.

### The Settlement:

Having lost its motion for summary judgment, the trustee negotiated a settlement with Gowan and the first mortgagee to reduce the costs and delay to the estate from having to prosecute the adversary proceeding and defend against any appeals. The nub of the settlement is that the trustee and the first and second mortgagees agreed that the commercial property on which the restaurant was located would be sold by an auctioneer retained by the bankruptcy estate. The proceeds of the auction sale would be applied first to pay the expenses of the sale, then to the outstanding real estate tax liens against the property, next to the mortgage indebtedness to the first mortgagee, and then to the mortgage indebtedness of the second mortgagee, with the balance, if any, to be paid to the holders of junior liens in the order of their state law priorities. The benefit to the estate was that from the proceeds applicable to the first mortgage lien, the first mortgagee would release and transfer $10,000 to the estate, and that from the proceeds applicable to the second mortgage lien, the second mortgagee would release and transfer to the estate the first $100,000 applicable to its second mortgage lien. In further consideration of this settlement, the trustee agreed that the amount released and transferred by the second mortgagee to the estate could be recaptured, as it were, by Gowan as a general unsecured claim, sharing pro rata with all other holders of general unsecured claims. This last provision seemed to have little real-world effect, for it did not appear that there would be sufficient proceeds of sale to pay all expenses of sale and all liens; thus, it was improbable that Gowan would ever recapture any part of his $100,000 as an unsecured creditor.

Once the motion to settle was noticed to creditors, it was only Goodkin who objected to the trustee's motion. Although her counsel had earlier urged the trustee to settle this litigation for Gowan's payment of $50,000 to the estate, he now took the zealous position that the settlement should be rejected, the trustee and the trustee's special counsel should be removed, the litigation should proceed, and that he should be substituted as special counsel for the successor trustee to try the adversary proceeding. As noted above, Goodkin's counsel continued to argue and reargue in post-hearing submissions that the Court should reconsider its earlier ruling and now grant the trustee's motion for summary judgment against Gowan.

Goodkin, through her counsel, took the position that the objective of this entire settlement strategy was solely to generate a $110,000 fund with which to satisfy the sunk costs of professional fees incurred by the trustee, the trustee's general counsel— his own firm, the trustee's special counsel, and the trustee's accountants, with very little remaining for distribution to junior lien creditors below the second mortgagee or to unsecured creditors. The only provision to the settlement that opposing counsel supported was the $10,000 carve-out from the proceeds otherwise payable to the first mortgagee.

██ Goodkin also emphasized that the trustee presented no detailed analysis of the expected value of this litigation to the

estate—there was no statement of the probability of success on the merits, no discussion of the applicable case precedents, and no budget for the costs of continued litigation or appeal. There was, of course, no necessity for estimating collection risk because the recovery would be from the sale of the property. In order for the Court to be in a position to make an informed decision that the settlement was fair and in the best interest of creditors (other than the administrative expense claimants and the first and second mortgagees), it required just such a detailed justification. For instructive and detailed opinions denying inadequately justified Rule 9019 motions, *see especially In re Lion Capital Group*, 49 B.R. 163 (Bankr.S.D.N.Y.1985) and *In re Spielfogel*, 211 B.R. 133 (Bankr.E.D.N.Y.1997).

All that the trustee provided by way of a general justification was his statement that he was concerned with the credibility of John Gardi on any issues relevant to the intention of the parties and the transactional history because he was one of the joint and several judgment debtors under the Goodkin judgment. John Gardi would have to be the trustee's primary, if not sole witness, because his elderly father was too ill to testify and his mother had played no active management role in the restaurant business. Obviously the Court should give due deference to an experienced trial counsel's assessment of the credibility of his principal witness—he presumably has interviewed him at length and is in the best position to assess his credibility during trial. The trustee's explicit assessment of Gardi's credibility is, however, based upon the fact that this witness was found liable for sexual harassment against Ms. Goodkin in state court,[3] and that his credibility would be impeached on the ground of bias. Indeed, if this is one of the purported main reasons the trustee is unwilling to try this case, it seems a rather flimsy excuse.

For the first time, the trustee also raised another threshold issue of fact and law, and that is whether the defense of usury is precluded from being raised as a collateral attack on the judgment of foreclosure on the conventional state law ground of res judicata. This issue had not been raised and therefore had not been considered by the Court in denying the cross-motions for summary judgement discussed above. The disposition of this additional issue requires a legal determination under state law whether there is any exception under the applicable provision of the New York Code of Civil Procedure and Practice to the debtor's failure to raise an affirmative defense of usury before a default judgment of foreclosure became final.

In the state court foreclosure proceeding, the trustee's special litigation counsel pointed out that the debtor had retained prior counsel and that attorney had filed an appearance instead of an answer. This raises the issue whether a simple notice of appearance constitutes an intentional waiver of any affirmative defenses to the enforceability of the note and mortgage. This limits the mortgagor to notice of the foreclosure sale, which preserves only the right to object to the referee's report as to the amount of the indebtedness, to any defect in the sale procedure, including both failure to comply strictly with the notice and advertising provisions as well as any fraud or collusive bidding at the sale. Related to this same set of issues is the question whether there is so strong a public policy against usurious loans that a special exception from the general rule of

---

[3]. The judgment for damages arising from sexual harassment was the basis for her judg-

ment lien again the mortgaged premises.

proving excusable neglect has been recognized for delayed collateral attack on usury grounds upon a foreclosure judgment. The trustee and his special counsel submitted no memorandum of law that addressed this procedural issue.

In post-hearing submissions, Goodkin's counsel presented citations to New York state cases that he zealously argues show that a mortgagor can collaterally attack a default judgment of foreclosure based upon the defense of usury, and that the great importance of the public policy against usury overrides the general rule that the mortgagor has to prove excusable neglect. The Court will provisionally address this particular argument in the discussion section below.

### The Contested Motion for Approval of the Trustee's Settlement:

Based upon these open questions of law and fact, the trustee had made an implicit assessment of the probabilities of success concerning each of the disputed issues of fact and law, his apprehension concerning the declining value of the restaurant property, the anticipated cost to the estate of litigating these issues to conclusion, and the costs to sell the property. The trustee then made a combined business and legal judgment to settle this complex litigation at a value he deemed to be at a level that did not fall "below the lowest point in the range of reasonableness," the standard governing the approval of settlements in the Second Circuit.

In the end, the negotiated resolution was that the property would be sold such that the first $110,000 in net proceeds of sale (after paying closing costs and the broker's commission) would be paid to the estate, and after crediting $100,000 against the then outstanding mortgage balance to

Gowan, all valid liens of record would be paid to the extent of the remaining proceeds of sale in the order of their priority under state law. Conceptually, the $110,000 could be viewed as either a consensual surcharge or a carve-out to the estate under 11 U.S.C. section 506(c), or a consensual reduction in the secured loan balance by Transmedia and Gowan as mortgagees, in order to permit a trustee-controlled sale to go forward.

From Gowan's standpoint, he treats this as a very expensive nuisance settlement in order to put an end to his mounting litigation costs so that he can recover the reduced balance without incurring any further reductions in recovery attributable to (i) accruing (a) interest on the first mortgage and (b) real estate taxes; and (ii) any further market risk of devaluation. As Gowan's counsel has passionately and forcefully argued, he believes that the usury argument is sheer opportunism by the trustee's special litigation counsel against a private mortgage lender who advanced $200,000 over five years ago to a friend, who has been paid very little in interest, who has had to incur substantial and now unrecoverable litigation costs in both state court and in this case, and who has been effectively given no real alternative except to write off most of the unpaid interest accrued over the last six years.

Assume that the trustee's auctioneer is successful in selling the property for a gross price of $700,000. After deducting the proposed 10% commission payable to the auctioneer and other closing costs, the net proceeds would be approximately $615,000. If the trustee were to transfer the liens in order of priority to the net proceeds of sale, at first pass the application of proceeds would approximately be: [4]

---

4. There is some dispute between the trustee and Goodkin concerning the correct amounts of both the state tax lien and the non-punitive damages under her judgment lien.

| | | |
|---|---|---|
| | Net Proceeds | $615,000 |

Less:

| 1. | Estate | $110,000 |
|---|---|---|
| 2. | Nassau County/Breen Capital | $220,000 |
| 3. | Transmedia Network | $ 65,000 |
| 4. | Gowan | $220,000 |

There would be insufficient proceeds to pay any further recorded liens to any other prepetition creditors, which in order of priority were:

| 4. | Bauda Designs | $ 10,000 |
|---|---|---|
| 5. | Goodkin | $ 70,000 |
| 6. | Cardiovascular | $ 1,000 |
| 7. | LI Beverages Systems, Inc. | $ 4,000 |

The risk of nonpayment fell to Gowan, for if the property netted anything less than $615,000, as the last creditor "in the money," the proceeds payable to him would be determined by the amount the property netted less the prior payments to the estate, Nassau County/Breen, and Transmedia, which totaled $395,000. So, for example, if the net proceeds were $515,000 (assuming a $600,000 gross sale price at the auction), then Gowan would be paid only $120,000. But he was willing to suffer that risk of loss in order to recover whatever he could from an auction sale without having to incur further attorney's fees and the opportunity costs of delay in final payment.

The judgment creditor's objection is that the trustee in his moving papers did not "do the math" and because of this, no creditor (nor the Court) is in a position to make a reasoned judgment whether this settlement is fair and reasonable and in the best interest of creditors. In this respect, Goodkin forcefully argues the trustee failed to provide a detailed justification for this proposed settlement, as he is obligated to do as a matter of law, and, as such, the motion should be denied as substantively and procedurally defective.[5]

Moreover, the judgment creditor also raises the objection that the only persons or entities who seem to benefit from this settlement from the standpoint of the estate are the trustee, his general counsel, and his special counsel. From this creditor's standpoint, no monetarily significant amount of the $110,000 recovery to the estate will trickle down to the class of unsecured creditors. Based upon the judgment creditor's best estimate, after calculating the amount of secured indebtedness above her lien, she will find herself with a substantial deficiency, and thus will share pro-rata with the other unsecured creditors to the extent of her deficiency, treated as an unsecured claim. Finally, the judgment creditor asks that her counsel be substituted as special counsel to the trustee with the opportunity to continue the prosecution of the pending adversary proceeding with the expectation that Gowan's entire lien can be avoided. As this Court has recently held in *In re Greenberg*, 266 B.R. 45 (Bankr.E.D.N.Y.2001), if the judgment creditor wishes to purchase the estate claim, then it will have to make a bid in an amount that realizes at least the same amount the estate would yield, and the Court would have to determine whether approval of such a sale would be appropriate in the totality of the circumstances of this case. But no such offer was made so this alternative becomes moot.

## Discussion

■ In Paragraphs 13 through 16 of his Application, the trustee has adequately and succinctly summarized the generalized standard of law purportedly governing a bankruptcy court's approval of settlements.[6] The "ur-text" or the foundational

---

5. *In re Spielfogel*, 211 B.R. 133 (Bankr. E.D.N.Y.1997).

6. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599 (2d Cir.1983), *citing Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert denied*

statement is *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1, *reh'g den.,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968). The Court of Appeals has duly followed that precedent in the procedural context of what we now refer to as a Rule 9019 motion, beginning with *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599 (2d Cir.1983), *citing Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert denied sub. nom Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) and its many progeny, including recently *Depo v. Chase Lincoln First Bank, N.A. (In re Depo),* 77 B.R. 381 (N.D.N.Y.1987), *aff'd,* 863 F.2d 45 (2d Cir.1988).

In this particular case, goaded by Goodkin's counsel, the trustee remedied his earlier failure to justify the settlement in both his supplemental submission and in his oral representations and arguments during the extended hearing in open court. During the extended hearing, the Court was presented with all of the components that would ordinarily go into a formal decision analysis, and in this crucial respect, the Court is now satisfied that the trustee has satisfied the generalized standard under the case law in this Circuit.

The trustee has adequately explained that in this current real estate market, he would probably not receive a bona fide offer from a creditworthy purchaser for the restaurant and the underlying real estate for greater than $700,000. Indeed, there is some doubt on the part of the proposed auctioneer that the property will sell for a gross price greater than $500,000. This lower expectation is based upon the fact that the restaurant has been closed since January of 2001 and the considerable uncertainty in the market for restaurant properties in that part of Long

Island following the horrific acts that occurred on September 11 at the World Trade Center less than 40 miles from the property. In the months of October and November, unemployment had increased nationally to 5.7%, and close to 100,000 jobs were lost in the Greater New City area. Many of the persons who would have frequented the restaurant are now out of work, and other retail businesses in the area are suffering from shrinking sales. Moreover, this property had been exposed to the market for more than six months before September 11, and the only offer for cash within that range was withdrawn before it could be approved by this Court. The prospective purchaser represented to the seller that after the horrific events of September 11, that commercial lenders were not prepared then to underwrite mortgage loans on pre-September 11 appraised values. At this juncture, the trustee is prepared to employ an experienced auctioneer to conduct an auction sale of the property, and the Gardis have consented to that mode of disposition.

Assume that an auction sale brings a gross amount of $500,000. The trustee has to discount this amount by the probability of success on the merits of his complaint, which in this context means obtaining a judgment that voids any obligation of the co-makers under the loan agreement based upon the conclusion of law that the loan was usurious. The trustee has had to consider as part of his analysis that if the corporate entity and the Gardis had filed a complaint alleging breach of performance by Gowan of his duty to promote the restaurant, whether a court would have granted any judgment for damages to the plaintiff because there is no objective benchmark or standard of performance made explicit under the provisions of the

*sub. nom Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

side agreement by which the performance of Gowan's duty could be measured. And if instead Gowan had filed a complaint alleging damages against the corporate defendant and the Gardis because the restaurant refused to offer him and his three guests complimentary meals despite his claim of having promoted the restaurant, would a court have granted any judgment for damages to Gowan for the same reason? Alternatively, would a court have granted declaratory relief to the corporate borrower and the Gardis by holding that the side agreement was wholly unenforceable because its terms were illusory? Finally, the trustee has to consider whether a state court would take the next two steps by declaring that the value of the complimentary meals received by Gowan and his guests was additional interest, and, therefore, that the mortgage loan agreement was a nullity, and that the mortgage lien was void or avoidable.

Although perhaps for understandable reasons, the trustee is not willing to disclose his estimated range of probability of a favorable outcome, he has finally presented a sufficient argument for this Court to draw a reasonable inference that the trustee would not have better than a 50% probability of prevailing on his usury argument. Indeed, the trustee could have concluded that upon further research and reflection, the probability of prevailing was no better than 30%, especially given the *de minimis* value of the meals and drinks served to Gowan and his guests. And this estimate would have to take into consideration that the Court could rule that the agreement entailed a bargained-for exchange of promises, and that it could find an implied standard of performance for measuring Gowan's promise to promote the restaurant.

The modern legal analysis of contracts generally tends to ignore the doctrine of consideration as by and large an outmoded and arid conceptualism, and identifies the bargained-for exchanges of promises instead as the basis for finding the agreement is an enforceable contract. To "save the appearances," a modern court will occasionally characterize the bargained-for exchange of promises as supplying the "consideration" to support enforcement, but bowing to "consideration" is not necessary or useful in determining whether a disputed contract should be enforced. And ever since Judge Benjamin N. Cardozo's opinion in *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917), the state courts in this jurisdiction (and most others) read an implied standard of "reasonable performance" as the basis for rejecting the contention that the disputed contract is illusory.[7] Under this approach, this Court could find the side agreement "instinct with an obligation" on the part of Gowan to engage in reasonable efforts to promote the restaurant, and if he failed to do so, then he would be materially in default of his obligation, and Portofino would be excused from its obligation to provide him and his permitted guests with complimentary meals and drinks.

Continuing with modern contract analysis, the courts usually find that a bilateral contract has been formed in a business setting, and then turn to the tougher task of concentrating on express or implied standards of performance or fashioning the appropriate remedy for breach of the contract. This Court is not disposed to invalidating a contract primarily on the ground that Gowan's obligation is referenced in

---

7. See generally, E. Allen Farnsworth, *Changing Your Mind: The Law of Regretted Decisions* (1998). For a thoughtful retrospective on Cardozo's contributions to the common law, see A. Kaufman, *Cardozo* (1988), and his discussion of *Lady Duff–Gordon* at 316–18.

the recitals rather than in the substantive provisions of a side agreement. That promotes the worst kind of "form over substance." Goodkin's counsel also cites a recent decision of the District Court for the Southern District of New York for the proposition that every basic bargained for promise "should be expressed as such and not left to implication."[8] As a general statement of judicial preference, one can hardly disagree—if this advice were followed, there would perhaps be fewer opportunities for litigation. However, the language quoted by Goodkin's counsel was not the basis for the decision in the *Cram v. Pepsico* case.

From this, it would follow that the agreement stood on its own as a separate agreement and that under the circumstances there was no basis in law for adding the value of the complimentary meals to the base interest rate in the mortgage note, and, therefore, the usury claim fails. If judgment were entered for the defendant Gowan, then his next step would be to renew his motion to lift the stay for there would be no equity in the restaurant property to be realized by the estate from the sale.

As part of his expected value analysis, the trustee had to consider this Court's prior (and continuing) unwillingness to grant either party summary judgment. This would mean that the trustee has to assess the strength of his case in chief. This necessarily includes his assessment of who is available to testify to the "intention of the parties" under the contract with respect to Gowan's promotional efforts, its transactional history, and how credible and persuasive their testimony will be. It is uncontested that John Gardi attended the closing of the Gowan mortgage loan and was an active participant in the negotiations. The prima facie claim of sexual harassment does not include the truthfulness or deceit of the tortfeasor as one of its elements. The fact that a court has found a tortfeasor liable for sexual harassment should not cause this Court to discount his testimony, even if the objecting creditor to the proposed settlement in this adversary proceeding holds a judgment which arose from his wrongful conduct.

The trustee also made this same point about the difficulty in proving the facts with respect to the number of complimentary meals that Gowan and his guests enjoyed. However, as the objecting judgment creditor acutely and persuasively commented, Gowan has already admitted to at least two meals in his pleadings and supplemental papers. If the value of the meals were as a matter of law to be added to the interest rate, then the trustee would require no testimony on the part of any of the Gardis if he could get past the contested issue of law.

The trustee made the further point in his supplementary pleadings and during his argument that he was not fully satisfied that he could meet his burden to reopen the judgment of foreclosure in the first instance. This is because, as he read the settled law of the State of New York, that law imposes not only strict time constraints under the applicable statute or rules of limitation to raise usury as a defense, but also that the filing of an appearance by the debtors' initial counsel in the underlying foreclosure action and his allowing the entry of a default judgment to be entered may very well support Gowan's averment that the Gardis are barred under the doctrine of res judicata from now collaterally attacking the judgment.

Although this Court declined to grant summary judgment to either party, this

8. See *Cram v. Pepsico, Inc.,* 125 F.Supp.2d 102, 104 (S.D.N.Y.2000).

Court has now had a reasonable opportunity to read the cases cited in the last few weeks in Goodkin's counsel's cascading memoranda of law. The only cases cited by the trustee's special counsel address very different fact situations, and it would require quite a stretching of his most favorable cases to reach the same substantive outcome. In the case upon which special counsel primarily relies, the state court permitted the claim of usury to be raised, not as to the underlying mortgage debt before the foreclosure sale, but only to the enforceability of a deficiency against the guarantors of the mortgage debt after the foreclosure sale was held. Surely a state court can perceive relevant equitable considerations to protecting individual guarantors from having to pay a deficiency amount that is qualitatively different from relieving the mortgagor from the entire judgment amount.

The trustee can now make a respectable argument, based upon recent case law, that the public policy against usury creates its own special exception to the general rule under N.Y. C.P.L.R. 5015(a)(3) that requires an adequate showing of excusable neglect to reopen a default judgment. It is not, however, necessary or appropriate at this juncture for the Court to present a detailed analysis whether this argument should prevail under the totality of the facts and circumstances of this case, but in fairness to the parties, it strikes this Court as tending to favor the trustee's complaint.

Unfortunately, reopening the default judgment is not the kind of slam-dunk that Goodkin's counsel characterizes the argument to be. From this Court's review of the cases, the mortgagor's showing of a defense of usury has to be *substantial.* The transactional facts of the published opinions cited by Goodkin's counsel granting a motion to reopen a default judgment were in every case far more compelling

than are the contested facts in this adversary proceeding. There is no doubt in the mind of this Court that the magnitude of the actual amount of the additional interest above the usury ceiling plays a determinative, if not decisive, role in the decisions of the state courts in deciding whether to reopen a default judgment. Moreover, in the case most favorable to the trustee, as cited by Goodkin's counsel, *National Travis Inc. v. Gialousakis,* 120 Misc.2d 676, 466 N.Y.S.2d 624, *aff'd* 99 A.D.2d 800, 471 N.Y.S.2d 1023 (2d Dept.1984), the appellate court based its decision to reopen the default judgment largely on the mortgagee's false representation to the foreclosure court that the loan did not bear any interest rate. The appellate court relied upon the mortgagor's affidavit that alleged that only $25,000 was advanced by the mortgagee, even though the note was written for a thirty-six month term with level payments of "principal" of $1,000. The rationale in *Gialousakis* to justify reopening a default judgment of foreclosure has been followed by the Third Department in *Rockefeller v. Jeckel,* 557 N.Y.S.2d 648, 161 A.D.2d 1090 (3d Dept.1990). In *Rockefeller,* a note re-executed in March of 1987 after a default under the original loan agreement increased the interest rate beyond the usury limit of 24% applicable to a loan of that character. Although the *Rockefeller* court held the replacement note to be void, it limited the mortgagor's remedy to reinstating the original note and crediting the mortgagor's loan balance for any payments made under the replacement note.

Notwithstanding these two precedents, in the most recently reported decision, the Second Department summarily affirmed the trial court's decision denying the mortgagor's motion to set aside a foreclosure sale on the ground of usury. The appellate court expressly held:

a judgment of foreclosure and sale entered against a defendant is final as to all questions between the parties, and concludes all matters of defense which were or might have been litigated in the foreclosure action (citing cases). Accordingly, the defendants are barred from now raising usury as a defense to this action since they could have asserted such defense at an earlier time, but failed to do so.

*Long Island Savings Bank, F.S.B. v. Mihalios*, 269 A.D.2d 502, 704 N.Y.S.2d 483 (2000). In the face of these conflicting precedents from the Second Department, which encompasses Nassau and Suffolk Counties, it would appear that it would be a proper exercise of the trustee to estimate his probability of success in prevailing on the issue of res judicata as 50% at best.

The trustee was also legitimately concerned with adding to the estate's estimated cost of prosecuting this adversary proceeding through final judgment, assuming no appeals, and the continued diminution of net value to the estate of the property (i) through the accrual of unpaid real estate taxes, interest on other mortgage liens, and taxes, as well as (ii) market uncertainties and fluctuations. During the hearing, the trustee stated that he would

estimate the attorney's fees to prosecute the case, including the time to prepare for the trial, to attend trial, and to submit post-trial proposed findings of fact and law and a supporting memorandum to have an extended time value of $15,000, assuming an aggregate of 54 [9] hours at a blended rate of $275 an hour. Goodkin's counsel argued that this projection was unduly exaggerated, and that he could do it for far less. As the Court commented during the oral argument, it is the trustee who has the statutory right to retain counsel; it is not an appropriate function of the Court to let the retention of the trustee's special (or general) counsel out for bids.

Based upon these considerations, the Court can now construct a table of the basic components to this type of analysis.[10]

| | | |
|---|---|---|
| 1. | Maximum range of recovery: | $315,000 |
| 2. | Probability of success re overcoming res judicata: | .3 to .5 |
| 3. | Probability of success re: usury: | .4 to .7 |
| 4. | Costs of continued prosecution: | $ 15,000 |

If the maximum expected value is less than $110,000, there is no need to take into further consideration deductions for accruing taxes, interest, and market risk.

Assuming the reasonableness of these valuations, the calculation of the net expected value, *for the best case probabilities*, is very straightforward:

$$\underline{\hspace{5cm}\$315.0\hspace{2cm}}$$

[.5 prob.—res jud.] × [.7—prob.—integr. agr.] = [.35] × [$315] = $110.25
Less further litigation costs = $ 15.00

Net maximum recovery to the estate = $ 94.25

If one were to calculate for the lower case probabilities, then it would be:

---

**9.** This is based upon the active participation of both the trustee's counsel and the trustee's special counsel in the further prosecution of this proceeding, with each spending 6 hours in final trial preparation, 12 hours of trial, and 9 hours in drafting post-trial submissions. 54 hrs × $275 = $14,850, + $150 in reimbursable expenses for electronic legal research and reproducing costs. The Court can just as readily assume that only one attorney would represent the estate, that the trial time would be reduced to 8 hours; that would drop the cost to 23 hrs × $275 + $150 in expenses.

**10.** For purposes of this simplified analysis, we have excluded lost opportunity costs.

$$\underline{\hspace{6cm} \$315.0}$$

$$[.3 \text{ prob.—res jud.}] \times [.4\text{—prob.—integr. agr.}] = [.12] \times [\$315] = \$ \ 37.8.$$
$$\text{Less further litigation costs} = \$ \ 15.0$$

$$\text{Net maximum recovery to the estate} = \$ \ 22.8$$

Obviously, further sensitivity analysis could be performed by modifying the value of each of these variables across a range, and inevitably there will be questions about the reasonableness of any assumptions for any of these values. However, the Court is reasonably satisfied that kind of analysis was supported by the range of representations and arguments made by each counsel and their prior pleadings and memoranda.

■ Under the general standards, any settlement that does not fall below the lowest point in the range of reasonableness should be approved. Clearly, if the maximum net recovery is $94,250, then it would probably be an abuse of the trustee's fiduciary duty to decline this settlement. The trustee cannot treat the further prosecution of the litigation as a lottery, give up $110,000 in dollars on the table, and bet the entire estate by buying a $15,000 ticket (on credit) to win $315,000 when the odds of winning are at best 35%. Under the circumstances, the Court is sufficiently satisfied that the trustee has sustained his burden to justify granting his motion.

Since this Court has previously notified the panel of the case trustees that they should resort to formal decision analysis[11] as the basis for justifying their motions for authority to settle contested matters or adversary proceedings under Fed. R. Bankr.P. 9019, this opinion demonstrates not only how to go about identifying the variables and "doing the math," but it also presents a quantitative method or means

for demonstrating that a proposed settlement satisfies the formulaic limit of the lowest point in the range of reasonableness. *In other words, the lower limit of the decision analysis, if performed properly, may serve as the operational definition of the lowest point in the range of reasonableness.* Decision analysis, when properly performed, serves then as a reality check to test the reasonableness of the assumptions that should underlie each settlement because the trustee has to think carefully through the components of the analysis and then assign probabilities to the most probable range of outcomes.

As two final points, the first is that whether the recovery to the estate may be substantially reduced by the payment of allowed administrative expenses is both largely irrelevant and premature to this Court's determination of the reasonableness of a settlement. To be certain, there is something deeply disturbing to the public (and to this Court) about any litigation undertaken by a trustee whose primary goal is to maximize compensation for the professionals in the case, with no foreseeable benefit to the prepetition creditors of the estate. Surely that was the strongly voiced position of the district court in *McCord v. Agard (In re Bean)*, 251 B.R. 196 (E.D.N.Y.2000). However, the Court of Appeals properly pointed out that the issue of compensation for the trustee and his professional persons was a separate issue, and one that is properly deferred to

11. Decision analysis has been applied to the analysis of settlements in litigation as part of the law and economics approach for over thirty years. See R. Posner, *The Economics of Law* (4th ed.1992) and R. Cooter and T. Ulen, *Law and Economics* (2d ed.1996).

a hearing on final compensation. *Id.*, 252 F.3d 113 (2d Cir.2001). This same logic applies to this case.

The Office of the United States trustee invariably objects to any final allowance of the trustee's commission and the trustee's general and special counsel's attorneys' fees that are not reasonably related to the benefit actually received by the priority and general unsecured creditors of the estate. In this fundamental respect, the objection of Goodkin on this point—that the bulk of the $110,000 will be exhausted in professional fees is wildly exaggerated and not informed by any knowledge of the actual and consistent practice of the bankruptcy judges in this Court. In any event, the judgment creditor, the United States trustee, and any other party in interest will have an opportunity to file objections to any requests for interim or final compensation by the trustee and his professional persons.

### Conclusion:

Based upon these considerations, the trustee's motion for authority to settle is granted, and the objections of the judgment creditor are overruled. SO ORDERED.[12]

---

12. This opinion is intended to supersede in all respects the Memorandum of Decision issued on January 9, 2002.